**JAMESON CROSSE, INC., Plaintiff,**

v.

**KENDALL–JACKSON WINERY, LTD., Defendant.**

**No. 5:95 CV 0390.**

United States District Court, N.D. Ohio, Eastern Division.

March 6, 1996.

James B. Niehaus and Daniel W. Hammer, Sr., Thompson, Hine & Flory, Cleveland, Ohio, for plaintiff.

An appeal may not be taken *in forma pauperis* if the trial court certifies that it is not taken in good faith.

John D. Parker and Lisa Hammond Johnson, Baker & Hostetler, Cleveland, Ohio, Alfred J. Weisbrod, Weisbrod & Lopez, Troy, Ohio, for defendant.

## MEMORANDUM OPINION INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. INTRODUCTION

DOWD, District Judge.

The Court is called upon to settle a dispute involving the implications under the Ohio Alcoholic Beverages Franchise Act of the sale of the controlling stock interest of an alcoholic beverage distributorship.

Plaintiff Jameson Crosse, Inc. ("Jameson Crosse") is a distributor of alcoholic beverages and since 1989 has had a franchise relationship with defendant Kendall–Jackson Winery, Ltd. ("Kendall–Jackson"), a wine producer, for the distribution of Kendall–Jackson's products in Summit, Medina and Portage counties in northeast Ohio. The parties' relationship is governed by the Ohio Alcoholic Beverages Franchise Act, O.R.C. § 1333.82 et seq. ("OABFA" or "the Act"). On September 16, 1994, the shareholders of Jameson Crosse sold all of the company's stock to another distributor, The Hammer Company ("Hammer"). After learning of the transaction, Kendall–Jackson notified Jameson Crosse it was terminating the franchise relationship. Jameson Crosse filed suit to enjoin termination in Common Pleas Court of Summit County, Ohio. The state court granted Jameson Crosse's request for a preliminary injunction, maintaining the franchise relationship pending trial.

Kendall–Jackson removed the case to federal court pursuant to 28 U.S.C. § 1441. The Court approved Jameson Crosse's unopposed motion to bifurcate the issues of liability and damages and conducted a bench trial on the issue of liability only.

1. The stipulation as submitted erroneously cited Ohio Rev.Code § 1332.82(B). The Court has corrected the citation and corrected the same error in stipulated fact # 8, infra.

2. Kendall–Jackson disputes whether Jameson Crosse continued to distribute Kendall–Jackson

## II. STIPULATED UNDISPUTED FACTS

The parties stipulated to the following undisputed facts:

1. Kendall–Jackson Winery, Ltd. is a foreign corporation engaged in the business of manufacturing or supplying wine to distributors located in the State of Ohio and elsewhere, and is a "manufacturer" as that term is defined in Ohio Rev.Code § 1333.82(B).[1]

2. On November 21, 1994, and for a period in excess of six months prior thereto, Kendall–Jackson was supplying wine products to Jameson Crosse for distribution to retail permit holders in Summit, Medina and Portage counties. A franchise relationship was established between the parties subject to all of the provisions of Ohio Rev.Code §§ 1333.82 to 1333.87.

3. Jameson Crosse has distributed Kendall–Jackson brands of wine in Summit, Portage and Medina counties continuously and exclusively from the period June 26, 1989 until at least September 16, 1994.[2]

4. The only written distribution agreement entered into between the parties was a distribution agreement dated June 26, 1989.

5. The initial term of the distribution agreement expired on June 25, 1990.

6. Following the expiration of the initial term, the distribution agreement was not extended in writing for a renewal term. No other written distribution agreement has been entered into by the parties after June 25, 1990.

7. Effective September 16, 1994, The Hammer Company, a wine distributor located in Cleveland, Ohio, purchased 100% of the outstanding shares of Jameson Crosse stock.

8. The November 21, 1994[3] letter from Majestic Marketing Group, Ltd. was intended to be notice to Jameson Crosse of termination of its distributorship of Kendall–Jack-

wines subsequent to September 16, 1994, after all of its stock was acquired by Hammer.

3. The stipulation as submitted erroneously listed this date as November 21, 1995.

son brands in compliance with Ohio Rev. Code §§ 1333.82 through 1333.87.

9. There was no prior notice to Kendall–Jackson of the sale of 100% of the stock of Jameson Crosse to Hammer.

10. The first written notice Kendall–Jackson received of the sale of 100% of the stock of Jameson Crosse to Hammer was Jameson Crosse's letter dated September 20, 1994.

### III. ADDITIONAL FINDINGS OF FACT BY THE COURT

1. Jameson Crosse is a "distributor" within the meaning of Ohio Rev.Code § 1333.82(C) of the OABFA. It has approximately eighteen employees.

2. James S. Diehl is president of Jameson Crosse. Prior to September 16, 1994, he had been the sole owner of all of the common shares of Jameson Crosse stock. He and several family members owned ADRO, Inc., a holding company which owned all of the preferred shares of Jameson Crosse stock.

3. Sometime in early 1994, Diehl and representatives of Hammer began discussing Hammer's purchase of the stock of Jameson Crosse as a means of strengthening the wholesale business of both Hammer and Jameson Crosse. Negotiations culminated on September 16, 1994, with the sale of all of the common and preferred shares of Jameson Crosse stock to Hammer.

4. As a result of the acquisition, Jameson Crosse no longer distributes in the Cleveland area and Hammer no longer distributes in the Akron area. Otherwise Jameson Crosse conducts business essentially the same as prior to the sale. Jameson Crosse continues to exist as a wholly owned subsidiary of Hammer with responsibility for distributing wine beverages in the Akron sales area, which consists of Summit, Medina and Portage counties. It has its own payroll and bank accounts. Transactions with Hammer are conducted in the same fashion as with an outside entity.

5. At the time of the stock transaction, Diehl entered into an employment agreement with Hammer in which Diehl's duties at Jameson Crosse remained substantially the same. A significant part of Diehl's compensation was based upon sales generated in the Akron sales area.

6. During the course of negotiations, Diehl considered whether it was appropriate or necessary to notify and receive prior approval from Jameson Crosse's suppliers, including Kendall–Jackson, of the impending stock sale. Diehl consulted with Hammer representatives on this matter.

7. Diehl and Hammer representatives decided negotiations should proceed confidentially. They concluded from a business standpoint that telling employees and customers could disrupt business, trigger rumors from competitors and jeopardize the anticipated sale. They also reviewed the OABFA and formed an opinion that advance notification to suppliers was not necessary from a legal standpoint.

8. The decision to proceed without notifying suppliers and employees was made in good faith and was an exercise of reasonable business judgment.

9. Diehl devised a plan for notifying employees and suppliers and proceeded accordingly. He informed employees immediately after the stock purchase closed. He began contacting Jameson Crosse's approximately forty suppliers by telephone the first business day after closing.

10. Jameson Crosse conducted business with Kendall–Jackson through the latter's marketing agent, Majestic Marketing Group, Inc. ("Majestic Marketing").[4] On the first business day after the transaction closed, Diehl attempted to telephone Andy Clark, the district sales representative of Majestic Marketing, and left a message. Clark did not return the call.

11. Difficulties in contacting Majestic Marketing continued for several days. Finally Diehl composed a letter to Clark, advising him of the sale and requesting a meeting to explain further the benefits to Kendall–

---

4. Although no evidence was presented on the matter, it appears that the nature of Majestic Marketing's relationship with Kendall–Jackson was such that Majestic Marketing had full authority to make all business decisions relevant to this case.

Jackson. The letter described the transaction as "a merger agreement with The Hammer Company, Cleveland, whereby The Hammer Company purchased 100% of the stock, including all assets, of Jameson Crosse."

12. The letter was inaccurate in that 1) the transaction was not a merger, and 2) no assets were sold.

13. Diehl is not an attorney and did not intentionally mislead Kendall–Jackson. Indeed, other parts of the letter, such as his statement that Jameson Crosse would be kept "virtually intact," created ambiguities as to the true nature of the transaction.

14. Subsequent to sending the letter, Diehl spoke with Majestic Marketing representatives and requested a meeting at the earliest possible date. A meeting was arranged for October 24, 1994, some five weeks after the transaction was announced.

15. Prior to the October 24 meeting, officials at Majestic Marketing, including President Ken O'Farrell and Central Regional Sales Manager Martin Nitz, decided to terminate Kendall–Jackson's franchise relationship with Jameson Crosse. Nitz admitted at trial that Majestic Marketing did not attend the meeting with an open mind because the decision to switch distributors "was probably a foregone conclusion." (Transcript of trial at 129).

16. Prior to the October 24 meeting, Majestic Marketing representatives had met with at least two other distributors to discuss the prospect of taking over the area covered by Jameson Crosse.

17. At the October 24 meeting, Hammer and Jameson Crosse representatives outlined the details of the transaction and the resulting benefits to Kendall–Jackson. Majestic Marketing representatives listened to the presentation and were noncommittal about the future of the relationship between Jameson Crosse and Kendall–Jackson.

18. The next correspondence from Majestic Marketing to Jameson Crosse was a letter dated November 21, 1994, informing Jameson Crosse that Kendall–Jackson was terminating the franchise relationship. Majestic Marketing stated that the sale to Hammer violated the requirements of the "Ohio Franchise Act" (presumably the OABFA), giving Majestic Marketing the right to terminate. Majestic Marketing objected to the sale for the following reasons: 1) the distant location of Hammer's warehousing and office facilities in Cleveland; 2) the loss of key personnel at Jameson Crosse following the purchase; 3) the conflict between brands carried by Hammer and Kendall–Jackson, and 4) the strengths and advantages offered by alternate distributors in the Akron area.

19. Further attempts by Hammer and Jameson Crosse representatives to contact Majestic Marketing were unavailing, and this suit was filed in order to stop Kendall–Jackson from terminating the franchise and starting a franchise relationship with another distributor for the Akron sales area.

20. Kendall–Jackson is one of Jameson Crosse's fastest-growing suppliers. Jameson Crosse's sales of Kendall–Jackson wines have increased from 1,000 cases in 1993 to 1,700 cases in 1994 to 2,200 cases in the first eleven months of 1995. This is despite the fact that Majestic Marketing has not provided Jameson Crosse with any advertising displays or assistance since this controversy began.

21. At the time of the stock sale, representatives of Hammer and Jameson Crosse contemplated that, over the course of the ensuing few months, Jameson Crosse would liquidate and the two companies would consolidate into one office and warehouse in Cleveland. The parties do not dispute that such a consolidation would have given Kendall–Jackson (and any other Jameson Crosse distributor) the right to terminate the franchise under O.R.C. § 1333.84(F).

22. However, such consolidation did not take place and is no longer contemplated. The decision not to consolidate was made in part to enable Jameson Crosse to continue its franchise relationship with Kendall–Jackson. It also was made in part because of Jameson Crosse's subsequent purchase of a major distributorship in the Canton area just south of Akron, making it more appealing to maintain a presence in Akron.

23. After the stock sale was completed, Hammer representatives notified the Ohio

Department of Liquor Control of the stock transfer.[5] Hammer representatives reported to ODLC their plans to liquidate Jameson Crosse within sixty days, at which time Jameson Crosse's liquor permits would have been surrendered to the ODLC.

24. An ODLC official told Hammer not to go through the paperwork requesting consent of transfer of stock ownership so long as the consolidation would be taking place within the next few months. When Hammer and Jameson Crosse decided not to consolidate, Hammer made the required application for consent, which was approved.

## IV. DISCUSSION

### A. Applicable Law

The OABFA establishes a franchise relationship between manufacturers and distributors of alcoholic beverages. The Act requires good faith and fair dealing and generally prohibits either the manufacturer or distributor from terminating the relationship without just cause or the prior consent of the other party. See O.R.C. § 1333.85.

Important to this controversy is § 1333.84, which provides:

[N]o manufacturer or distributor engaged in the sale and distribution of alcoholic beverages ... shall:

(F) [F]ail to act in good faith in accordance with reasonable standards for fair dealing, with respect to the distributor's right to sell, assign, transfer or otherwise dispose of his business, in all or in part, except that the distributor shall have no right to sell, assign, or transfer the franchise without the prior consent of the manufacturer, who shall not unreasonably withhold his consent.

This provision makes a subtle but critical distinction. While a distributor may dispose of its "business" without manufacturer consent, it has no such unrestrained freedom with regard to disposing of its "franchise."

Disposition of the franchise is not permitted without the consent of the manufacturer.

### B. Positions of the Parties

Kendall–Jackson insists that Hammer's purchase of Jameson Crosse's stock constituted the sale of the franchise without Kendall–Jackson's consent, in violation of the Act. It points out that Diehl's letter announced the transaction as a "merger" and a sale of the "assets" of Jameson Crosse. It argues that the franchise is an "asset" which would have been included in such a sale.

Further, Kendall–Jackson argues that the stock sale required transfer of the liquor permits from the prior shareholders (Diehl and ADRO) to Hammer under O.R.C. 4303.293. It argues that the transfer of the liquor permit is tantamount to transfer of the franchise. Finally, Kendall–Jackson asserts that Hammer and Jameson Crosse did not act in good faith in changing course on their plans to consolidate as a response to Kendall–Jackson's disapproval the transaction.

Jameson Crosse responds that Kendall–Jackson is misconstruing the nature of the transaction. It asserts that a stock sale is not the sale of any asset, including a franchise. It argues that Kendall–Jackson had sufficient notice of the true nature of the transaction, precluding it from relying upon Diehl's original characterization of the deal as a merger. Jameson Crosse continues to operate as a separate entity and argues that the franchise was never affected by any change in possession or control of liquor permits.

### C. Analysis

The Court finds that Kendall–Jackson is trying to read into the controlling law what simply is not there, i.e., that a transfer of a majority of stock is the equivalent of a transfer of the franchise, requiring prior consent of the manufacturer. A franchise agreement is an asset of a corporation. This transaction

---

5. O.R.C. § 4303.293 requires notification to the Ohio Department of Liquor Control (ODLC) within fifteen days of the transfer of majority stock ownership in a company possessing a liquor permit. The statute treats a proposed transfer of majority of stock as a proposed transfer of ownership of the permit and requires ODLC consent. There is some dispute, which is irrelevant for purposes of this trial, over whether the notification took place within fifteen days of the transfer.

was merely a stock transfer, not an asset transfer. Jameson Crosse continues to exist as a relatively unchanged corporate entity.[6]

Section 1333.84(F) by its terms requires manufacturer consent only when the distributor is attempting to dispose of the "franchise." Had the Ohio legislature wished to require manufacturer consent for the sale of a controlling portion of a distributor's stock, it could have done so. Such a requirement was adopted by the legislature in the context of motor vehicle franchise relationships. O.R.C. 4517.56(A) requires franchisor notice and approval of "the sale or transfer of the business and assets *or all or a controlling interest in the capital stock* ..." (emphasis added).

Comparing the relevant portions of the motor vehicle and alcoholic beverage franchise laws is instructive. In granting a temporary restraining order in a case involving similar facts, Judge Bell observed:

> Were there, as Defendant argues, no meaningful distinction between a corporation's sale of its business and assets on the one hand, and the sale of the actual corporation on the other, the legislature would have had no obvious purpose in retaining the language [in § 4517.56(A) ]. . . . Rather than assume that it acted gratuitously, it is well to conclude that the legislature preserved the additional language because that body in fact perceived a distinction and wished to address both circumstances. Had it wished to do so, it could have similarly addressed both circumstances in O.R.C. § 1333.84(F). Its failure or refusal to do so cautions this Court against judicially broadening the literal scope of that statute's prohibition.

*Jameson Crosse, Inc. v. The Wine Group, Inc.*, No. 5:94–CV–2321 (N.D.Ohio 1994).

Kendall–Jackson seeks to focus the Court's attention on the Ohio liquor permit statute, O.R.C. Chapter 4303. However, the liquor permit statute governs the relationship between the state and the permit holder. This case concerns the relationship between a manufacturer and a distributor. The Court sees no justification for superimposing the liquor permit laws over the relationship between the two parties.

Accordingly, Jameson Crosse did not need Kendall–Jackson's consent, prior or otherwise, to the stock transaction with Hammer. Further, Kendall–Jackson has not shown that Jameson Crosse otherwise violated the OABFA by acting in bad faith either in failing to provide prior notice of the transaction or in preserving its corporate status as a wholly owned subsidiary.

## V. CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction of this controversy under 28 U.S.C. § 1332, inasmuch as the parties have diversity of citizenship and the matter in controversy exceeds $50,000, exclusive of interest and costs.

2. Kendall–Jackson and Jameson Crosse had a franchise relationship for the supply and distribution of alcoholic beverages governed by the Ohio Alcoholic Beverages Franchise Act, O.R.C. § 1333.82 *et seq.*

3. Under § 1333.82(D) of the Act, a "franchise" is defined as "a contract or any other legal device used to establish a contractual relationship between a manufacturer and a distributor."

4. The language of § 1333.84(F) is clear. It requires manufacturer consent only if the distributor would "sell, assign, or transfer" the franchise.

5. The sale of a majority interest in stock is not a sale, assignment, or transfer of a franchise agreement. Notwithstanding the stock sale, the franchise at all times remained the property of Jameson Crosse.

6. Accordingly, Jameson Crosse did not need Kendall–Jackson's consent, prior or otherwise, for the sale of a majority interest in its stock. Kendall–Jackson's disapproval of the sale did not constitute legal justification for terminating the franchise.

7. O.R.C. Chapter 4303, governing the issuance and transfer of liquor permits, regulates the relationship between the state and

---

**6.** Although Kendall–Jackson contended that Jameson Crosse lost key personnel and otherwise was weakened by the transaction, it offered no such evidence.

the permit holder. It is not applicable as a substantive rule of law to regulate the franchise relationship between manufacturer and distributor.

8. Jameson Crosse did not otherwise act in bad faith toward Kendall–Jackson, either in declining to provide advance notification of the stock transfer or in maintaining its corporate status as a wholly owned subsidiary of Hammer after the transfer.

9. Not having presented any ground for termination supported by the OABFA, Kendall–Jackson's attempted termination of the franchise violated the Act.

## VI. CONCLUSION

For the reasons set forth above, Kendall–Jackson's attempt to terminate the franchise without legal justification constitutes a violation of the Ohio Alcoholic Beverages Franchise Act. Accordingly, the Court finds for Jameson Crosse in this liability phase of the trial. The Court will schedule a trial on the issue of damages only.[7]

IT IS SO ORDERED.

## JUDGMENT ENTRY

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment Entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that defendant's attempted termination of the franchise agreement at issue violated the Ohio Alcoholic Beverages Franchise Act. Judgment for plaintiff in the liability phase of this bifurcated trial. The Court will proceed to conduct a trial to establish damages.

IT IS SO ORDERED.

---

**7.** Jameson Crosse filed a post-trial motion to strike "ex-record and false references in defendant's post-trial brief." (Docket No. 30). Because the Court did not rely upon the contested information in reaching its decision, the motion is denied as moot.