748 So.2d 993 (1999)
Dwayne HAWKINS and Millard G. Ripley, Appellants,
v.
FORD MOTOR COMPANY, Appellee.
No. 92,503.
Supreme Court of Florida.
October 14, 1999.
*994 Daniel E. Myers and Walter E. Forehand of Myers, Forehand & Fuller, Tallahassee, Florida, for Appellant
Dean Bunch of Sutherland, Asbill & Brennan LLP, Tallahassee, Florida, and John H. Fleming, Thomas W. Curvin and Amy K. Doyle of Sutherland, Asbill & Brennan LLP, Atlanta, Georgia, for Appellee.
James D. Adams of Adams & Quinton, P.A., Boca Raton, Florida, for South Florida Automobile and Truck Dealers Association and Greater Tampa Bay Automobile Dealers Association, Amici Curiae.
Wade L. Hopping of Hopping, Green, Sams & Smith, P.A., Tallahassee, Florida, Charles H. Lockwood II, Vice President and General Counsel, Association of International Automobile Manufacturers, Inc., and Daniel L. Goldberg and Alicia L. Downey, Boston, Massachusetts, for International Automobile Manufacturers, Inc. and American Automobile Manufacturers Association, Amici Curiae.
LEWIS, J.
We have for review a question of Florida law certified by the United States Court of Appeals for the Eleventh Circuit in Hawkins v. Ford Motor Co., 135 F.3d 1443 (11th Cir.1998), that is determinative of a cause pending in that court and for which there is no controlling precedent. Specifically, the Eleventh Circuit has certified the following question to this Court:
Does Fla. Stat. § 320.643(2)(a) provide the exclusive basis for objection by a motor vehicle manufacturer to the proposed transfer of all the equity in interest in a motor vehicle dealership?
Hawkins, 135 F.3d at 1445. We have jurisdiction. See Art. V, § 3(b)(6), Fla. Const. To more accurately reflect the facts at issue in this case, we rephrase the certified question as follows:
Does section 320.643(2)(a), Florida Statutes (1993), provide the exclusive basis for objection by a motor vehicle manufacturer to a proposed transfer of all the equity interest in a corporate motor vehicle dealership?
As explained more fully below, we answer the rephrased certified question in the negative and hold that the entire transaction must be analyzed and multiple statutory provisions considered depending on the structure of the entire transaction which, as here, may involve both a transfer of all the equity interest in a corporate motor vehicle dealership and a change in executive management control of that dealership.[1]
*995 On August 4, 1994, Dwayne Hawkins (Hawkins) and Millard Ripley (Ripley) entered into a stock purchase agreement with Wilson Davis, Sr. (Davis), Wade Bodiford (Bodiford), and Wilson Davis Ford, Inc. (Wilson Davis Ford),[2] a Plant City, Florida, corporate motor vehicle dealership operating under a sales and service agreement with Ford Motor Company (Ford).[3] Davis was the eighty percent stockholder and president of Wilson Davis Ford, and Bodiford was the general manager and twenty percent stockholder of that corporation. Under the terms of the agreement, Davis and Bodiford were to sell Hawkins and Ripley all of the stock in Wilson Davis Ford. The terms of the agreement also provided, in relevant part, that (1) Davis would resign as the "Dealer Operator" of Wilson Davis Ford; and (2) the agreement was contingent upon Ford's approval of the "Buyer" becoming the new "Dealer Operator" of Wilson Davis Ford, with the term "Buyer" being defined as including both Ripley and Hawkins.
On August 12, 1994, pursuant to section 320.643, Florida Statutes (1993), Davis and Bodiford notified Ford by letter of their intent to transfer ownership in Wilson Davis Ford. On the same day, pursuant to section 320.644, Florida Statutes (1993), Wilson Davis Ford (by letter signed by Davis and Bodiford) notified Ford of its intent to change its executive management. According to the letter explaining this change of executive management, Davis would no longer be president of Wilson Davis Ford and Bodiford no longer the general manager; Hawkins would become the new chairman of Wilson Davis Ford and Ripley the new dealer-operator. Along with these notices, Hawkins and Ripley supplied Ford with a letter indicating that they agreed to comply with the terms of the franchise agreement, and they supplied Ford with applications that (1) indicated that Hawkins would own eighty percent of Wilson Davis Ford and Ripley would own twenty percent; and (2) *996 contained full statements of Hawkins' and Ripley's associations with other motor vehicle dealerships.
After considering the proposed transaction, Ford determined that it was unacceptable and filed a verified complaint with the Florida Department of Highway Safety and Motor Vehicles (the DHSMV). In the complaint, Ford opposed both the proposed transfer of stock and the proposed change of executive management. With respect to its opposition to the proposed transfer of stock, Ford's complaint alleged several deficiencies in the financial qualifications of Hawkins and Ripley and several performance deficiencies of a Lincoln-Mercury dealership in which Hawkins had an ownership interest; these deficiencies, according to Ford, rendered Hawkins ineligible to meet Ford's reasonable standards for executive management. However, Ford did not challenge either Hawkins' or Ripley's moral character. With respect to the proposed change of executive management control, Ford's complaint alleged the same deficiencies, again not challenging either Hawkins' or Ripley's moral character.
Subsequent to the filing of Ford's complaint with the DHSMV, the stock purchase agreement was terminated[4] and the proceedings before the DHSMV were dismissed as moot. Hawkins and Ripley then filed suit in federal district court alleging, in pertinent part, that Ford had violated section 320.643, by opposing the transfer of stock to Hawkins and Ripley by means of a complaint that was facially deficient. Specifically, Hawkins and Ripley asserted that, notwithstanding the terms of the franchise agreement, the express terms of section 320.643(2)(a) governed the prospective transfer of stock in a motor vehicle dealership. Under section 320.643(2)(a), Hawkins and Ripley argued, Ford could object to the transfer of stock in Wilson Davis Ford only on the basis that Hawkins and Ripley were not of good moral character. Hawkins and Ripley noted that Ford's verified complaint did not challenge their moral character. Consequently, Hawkins and Ripley alleged that Ford's opposition to the proposed transfer of stock was in violation of section 320.643(2)(a).
In response to Hawkins' and Ripley's claims, Ford argued that where a proposed transfer of 100 percent of the equity interest in a motor vehicle dealer also leads to a change of executive management, the practical effect of such a transfer would be the transfer of the franchise agreement. Because of this alleged practical effect, Ford argued that the proposed transfer at issue would be regulated by the terms of sections 320.643(1) and 320.644, under which a manufacturer may object to a proposed transfer of a franchise agreement or change in executive management control based on business experience, lack of good moral character, or both. Consequently, Ford contended that it properly could object to the management experience and financial qualifications of Hawkins and Ripley, as it did in its verified complaint to the DHSMV.
After considering the parties' arguments, the district court agreed with Ford and held as a matter of law that "when transfer of 100% of stock is contemplated, the provisions regarding transfer of a franchise agreement and change in executive management control should apply." See Hawkins, 135 F.3d at 1445 (quoting from the district court's unpublished order). However, another judge in the same district court reached the opposite conclusion in Morse v. Ford Motor Co., No. 94-1013-CIV-T-17C, 1996 WL 420837, at *2-*3 (M.D.Fla. June 7, 1996), determining that only section 320.643(2)(a) applies to the proposed transfer of 100 percent of stock and, as a result, that only moral character may be considered as grounds for an objection to such a transfer. Appeals from the district court's decisions in Hawkins *997 and Morse were consolidated before the Eleventh Circuit, but Morse was dismissed due to a settlement agreement. See Hawkins, 135 F.3d at 1444 n. 1. After being presented with the parties' arguments on appeal, the Eleventh Circuit certified the question, now rephrased, which is currently pending before this Court for determination.[5]
To answer the rephrased certified question, we must determine the legislative intent governing the relationship among sections 320.643(1), 320.643(2), and 320.644. To ascertain this legislative intent, we must first consider the plain language of those statutory sections. See, e.g., Forsythe v. Longboat Key Beach Erosion Control Dist, 604 So.2d 452, 454 (Fla. 1992) (stating that "[i]t is a fundamental principle of statutory construction that where the language of a statute is plain and unambiguous there is no occasion for judicial interpretation."). Section 320.643(1), Florida Statutes (1993), provides:
(1) A motor vehicle dealer shall not transfer, assign, or sell a franchise agreement to another person unless the dealer first notifies the licensee[[6]]of his decision to make such transfer, by written notice setting forth the prospective transferee's name, address, financial qualification, and business experience during the previous 5 years. The licensee shall, in writing, within 60 days after receipt of such notice, inform the dealer either of his approval of the transfer, assignment, or sale or of the unacceptability of the proposed transferee, setting forth the material reasons for the rejection. If the licensee does not so inform the dealer within the 60-day period, its approval of the proposed transfer is deemed granted. No such transfer, assignment, or sale will be valid unless the transferee agrees in writing to comply with all requirements of the franchise then in effect. Notwithstanding the terms of any franchise agreement, the acceptance by the licensee of the proposed transferee shall not be unreasonably withheld. For the purposes of this section, the refusal by the licensee to accept a proposed transferee who is of good moral character and who otherwise meets the written, reasonable, and uniformly applied standards or qualifications, if any, of the licensee relating to the business experience of executive management required by the licensee of its motor vehicle dealers is presumed to be unreasonable. A licensee who receives such notice may, within 60 days following such receipt, file with the department a verified complaint for a determination that the proposed transferee is not a person qualified to be a transferee under this section. The licensee has the burden of proof with respect to all issues raised by such verified complaint. The department shall determine, and enter an order providing, that the proposed transferee is either qualified or is not and cannot be qualified for specified reasons, or the order may provide the conditions under which a proposed transferee would be qualified. If the licensee fails to file such verified complaint within such 60-day period or if the department, after a hearing, dismisses the complaint or renders a decision other than one disqualifying the proposed transferee, the franchise agreement between the motor vehicle dealer and the licensee shall be deemed amended *998 to incorporate such transfer or amended in accordance with the determination and order rendered, effective upon compliance by the proposed transferee with any conditions set forth in the determination or order.
(footnote added). Section 320.643(2), Florida Statutes (1993), provides:
(2)(a) Notwithstanding the terms of any franchise agreement, a licensee shall not, by contract or otherwise, fail or refuse to give effect to, prevent, prohibit, or penalize, or attempt to refuse to give effect to, prevent, prohibit, or penalize, any motor vehicle dealer or any proprietor, partner, stockholder, owner, or other person who holds or otherwise owns an interest therein from selling, assigning, transferring, alienating, or otherwise disposing of, in whole or in part, the equity interest of any of them in such motor vehicle dealer to any other person or persons, including a corporation established or existing for the purpose of owning or holding the stock or ownership interests of other entities, unless the licensee proves at a hearing pursuant to this section that such sale, transfer, alienation, or other disposition is to a person who is not, or whose controlling executive management is not, of good moral character. A motor vehicle dealer, or any proprietor, partner, stockholder, owner, or other person who holds or otherwise owns an interest in the motor vehicle dealer, who desires to sell, assign, transfer, alienate, or otherwise dispose of any interest in such motor vehicle dealer shall notify, or cause the proposed transferee to so notify, the licensee, in writing, of the identity and address of the proposed transferee. A licensee who receives such notice may, within 60 days following such receipt, file with the department a verified complaint for a determination that the proposed transferee is not a person qualified to be a transferee under this section. The licensee has the burden of proof with respect to all issues raised by such verified complaint.
The department shall determine, and enter an order providing, that the proposed transferee either is qualified or is not and cannot be qualified for specified reasons; or the order may provide the conditions under which a proposed transferee would be qualified. If the licensee fails to file such verified complaint within such 60-day period or if the department, after a hearing, dismisses the complaint or renders a decision other than one disqualifying the proposed transferee, the franchise agreement between the motor vehicle dealer and the licensee shall be deemed amended to incorporate such transfer or amended in accordance with the determination and order rendered, effective upon compliance by the proposed transferee with any conditions set forth in the determination or order.
(b) During the pendency of any such hearing, the franchise agreement of the motor vehicle dealer shall continue in effect in accordance with its terms. The department shall expedite any determination requested under this section.
Finally, section 320.644, Florida Statutes (1993), provides:
(1) No licensee shall prohibit or prevent, or attempt to prohibit or prevent, any motor vehicle dealer from changing the executive management control of the motor vehicle dealer unless the proposed change of executive management control of the motor vehicle dealer is to a person or persons not of good moral character or who do not meet the written, reasonable, and uniformly applied standards of the licensee relating to the business experience of executive management required by the licensee of its motor vehicle dealers. A motor vehicle dealer who desires to change its executive management control shall notify the licensee by written notice, setting forth the name, address, and business experience of the proposed executive management. A licensee who receives such notice may, *999 within 60 days following such receipt, file with the department a verified complaint for a determination that the proposed change of executive management will result in executive management control by persons who are not of good moral character or who do not meet such licensee's standards. The licensee has the burden of proof with respect to all issues raised by such verified complaint. If the licensee fails to file such verified complaint within such 60-day period or if the department, after a hearing, dismisses the complaint, the franchise agreement between the motor vehicle dealer and the licensee shall be deemed amended to incorporate such change or amended in accordance with the decision rendered. For the purpose of this section, the mere termination of employment of executive management, including the dealer/operator or such similarly designated person or persons, shall not be deemed to be a change in executive management or a transfer of the franchise. Provided, however, the designation of replacement executive management shall be subject to this section.
(2) During the pendency of any such hearing, the franchise agreement of the motor vehicle dealer shall continue in effect in accordance with its terms. The department shall expedite any determination requested under this section.
After considering the facts and documents at issue in this case in conjunction with the statutory sections set forth above, we find that the plain language of those sections requires a negative answer to the rephrased certified question.
We first analyze the relationship between sections 320.643(1) and 320.643(2). On its face, section 320.643(2) governs situations where there is a transfer of the equity interest in a motor vehicle dealership, whether that transfer is "in whole or in part." See § 320.643(2)(a), Fla. Stat. (1993). Contrastingly, section 320.643(1) applies in situations where the motor vehicle dealership attempts to the transfer its franchise agreement to another person or legal entity. See § 320.643(1), Fla. Stat. (1993). As it did in the proceedings before the federal district court and the Eleventh Circuit, Ford argues here that the transfer of all of the equity interest in a motor vehicle dealership constitutes a transfer of that dealership's franchise agreement. Similarly, the amici curiae appearing in support of Ford's position argue that the transfer of any controlling interest in a motor vehicle dealership constitutes a transfer of the dealership's franchise agreement. We find, however, that such interpretations would render meaningless the distinction between a franchise agreement, which is an asset of a corporate motor vehicle dealership, and an equity interest in the corporate motor vehicle dealership itself.
The United States District Court for the Northern District of Ohio addressed an analogous situation in Jameson Crosse, Inc. v. Kendall-Jackson Winery, Ltd., 917 F.Supp. 520 (N.D.Ohio 1996). In Jameson Crosse, a wine manufacturer argued that one of its corporate distributors had transferred its franchise because the stockholders of that distributor had sold all of their stock to another distributor. See 917 F.Supp. at 524. The distinction in Jameson Crosse between the transfer of a franchise and the sale of stock was important because the relevant statute permitted a distributor to dispose of its "business" without manufacturer consent, but the distributor was required to obtain the manufacturer's consent if the distributor disposed of its "franchise." See id. In analyzing the issue, the court stated the following:
The Court finds that [the manufacturer] is trying to read into the controlling law what simply is not there, i.e., that a transfer of a majority of stock is the equivalent of a transfer of the franchise, requiring prior consent of the manufacturer. A franchise agreement is an asset of the corporation. This transaction *1000 was merely a stock transfer, not an asset transfer. [The distributor] continues to exist as a relatively unchanged corporate entity.
Id. at 524-25. As the Jameson Crosse Court pointed out, there is a clear distinction between the transfer of an asset of a corporation, such as a franchise agreement, and a transfer of the stock in a corporation itself. See also Cruising World, Inc. v. Westermeyer, 351 So.2d 371, 373 (Fla. 2d DCA 1977). It is clear that the Legislature purposefully distinguished the two factual scenarios, and blending sections 320.643(1) and 320.643(2) in cases such as the present one would contradict the plain language of those statutory sections.
Not only would the interpretation espoused by Ford and the amici supporting Ford improperly blur the distinction between assets of a motor vehicle dealership and ownership in the dealership itself, it also would render superfluous the "in whole or in part" language contained in section 320.643(2)(a). "We are compelled by well-established norms of statutory construction to choose that interpretation of statutes and rules which renders their provisions meaningful. Statutory interpretations that render statutory provisions superfluous `are, and should be, disfavored.'" Johnson v. Feder, 485 So.2d 409, 411 (Fla. 1986) (quoting Patagonia Corp. v. Board of Governors of Fed. Reserve Sys., 517 F.2d 803, 813 (9th Cir.1975)); see also Unruh v. State, 669 So.2d 242, 245 (Fla. 1996). The Legislature clearly has established that the transfer of any equity interest in a motor vehicle dealership, in whole or in part, is governed by section 320.643(2), not section 320.643(1). Therefore, based on the plain language of sections 320.643(1) and 320.643(2), we reject the position asserted by Ford and the amici for Ford and find that section 320.643(2), not section 320.643(1), applies to cases such as the present one where the proposed transaction involves the transfer of stock in a corporate motor vehicle dealership, not the transfer of that corporate motor vehicle dealership's franchise agreement.
In addition to consideration of the plain language of sections 320.643(1) and 320.643(2), we find that the legislative history underlying those statutory subsections supports our conclusion regarding their relationship. Specifically, in 1980, the Legislature created section 320.643 to govern the transfer of franchise agreements. See Ch. 80-217, § 7, at 691, Laws of Fla. That newly enacted statute was comprised of only one section and referred only to franchise agreements. See id. In 1984, the Legislature amended section 320.643 by dividing the statute into two sections. See Ch. 84-69, § 8, at 176-77, Laws of Fla. Subsection (1) of the statute continued to govern transfers of franchise agreements, while subsection (2) was created to govern the transfer of an equity interest, in whole or in part, in a motor vehicle dealership. See id. As in the version of the statute at issue here, there was a verified complaint process available under subsection (2) of the 1984 statute; however, there was no such provision in subsection (1). See id. The Legislature added the verified complaint process to subsection (1) in 1988. See Ch. 88-395, § 13, at 2308, Laws of Fla. We find that this legislative history additionally supports our determination that the Legislature created sections 320.643(1) and 320.643(2) to govern different types of changes in a motor vehicle dealership. Although we agree with Ford and the amici for Ford that as a matter of public policy, manufacturers have a substantial and legitimate interest in designating those with whom the public will transact business, this Court may not rewrite statutes contrary to their plain language. The policy concerns raised by Ford and the amici for Ford more appropriately must be addressed by the Legislature.[7] While one *1001 may agree or disagree with the underlying policy concerns or wisdom of legislation with regard to the relationship of a franchise agreement to corporation and stock ownership, the inescapable legal conclusion[8] is that section 320.643(2)(a) may, under some other circumstances not present here, provide the exclusive basis for objection when the totality of the transaction is solely and exclusively an equity interest transfer.
We do find, however, that section 320.644, Florida Statutes, applies to purported equity interest transfers in circumstances such as this case because the terms and conditions of the proposed transaction at issue here involved not only the transfer of all the stock in Wilson Davis Ford, but also specifically required a change in the executive management control of that corporate motor vehicle dealership as a condition precedent; Hawkins was to become the chairman of Wilson Davis Ford and Ripley the new dealeroperator. Hawkins and Ripley, as well as the amici curiae arguing in support of Hawkins and Ripley, concede that section 320.644 applies in situations such as the present one where a change of executive management control of a motor vehicle dealership is proposed. Despite this concession, they argue that (1) Ford was required to approve the proposed transfer of stock in Wilson Davis Ford because Ford did not object to either Hawkins' or Ripley's moral character; and (2) after approving the transfer of stock, Ford could separately object to the change in executive management control. After considering the terms and conditions of the proposed transaction here and the applicable statutes, however, we cannot accept the position asserted by Hawkins, Ripley, and amici for Hawkins and/Ripley.
As explained above, section 320.643(2)(a) permits a motor vehicle manufacturer to challenge the proposed transfer of the equity interest in the motor vehicle dealership based on the proposed transferee's moral character, see § 320.643(2)(a), Fla. Stat. (1993), and the plain language of section 320.644 provides that the manufacturer may object to a change of executive management control based on the proposed executive management's moral character or standards related to business experience. See § 320.644, Fla. Stat. (1993). Contrary to the position taken by Hawkins, Ripley, and amici for Hawkins and Ripley, the proposed transaction here cannot be viewed in a vacuum. Instead, the totality of the transaction must be considered, not only the designation or name attributed to the documents. If the transaction here involved only a sterile transfer of an equity interest in a corporation, without more, only the criteria for objection set forth in section 320.643(2)(a) would be applicable. However, because the proposed transaction here involved not only the transfer of all the equity interest in Wilson Davis Ford, but also a change in the executive management control of that corporate motor vehicle dealership, section 320.643(2)(a) does not provide the exclusive basis for objection. The terms and conditions of the proposed transaction here were not separate and distinct, but were instead part of a unified whole. Therefore, in the present case, Ford could properly object to the proposed transaction based on the criteria set forth in both section 320.643(2)(a) and section 320.644. *1002 In conclusion, we find that section 320.643(1) does not apply in this case because the proposed transaction at issue did not involve a transfer of Wilson Davis Ford's franchise agreement. We also find that the criteria for objection set forth in section 320.643(2)(a) and section 320.644 are applicable in this case because the proposed transaction at issue involved not only a sale of stock in Wilson Davis Ford, but also a change in the executive management control of that corporate motor vehicle dealership. Accordingly, based on the above, we answer the rephrased certified question in the negative and return the record to the United States Court of Appeals for the Eleventh Circuit.
It is so ordered.
HARDING, C.J., SHAW, ANSTEAD and PARIENTE, JJ., and OVERTON and KOGAN, Senior Justices, concur.
WELLS, J., recused.
NOTES
[1] The present case is controlled by the 1993 version of the relevant statutes, but our determination in this case applies with equal force to the current statutory scheme because the current statutes are substantively the same as they were in 1993. Compare § 320.643, Fla. Stat. (1997), and § 320.644, Fla. Stat. (1997), with § 320.643, Fla. Stat. (1993), and § 320.644, Fla. Stat. (1993). The only change in the statutory scheme occurred in 1995, when the legislature amended section 320.643(1), Florida Statutes, by replacing gender-specific language with gender-neutral language. See Ch. 95-148, § 374, at 1147-48, Laws of Fla. (replacing "his" in the first sentence of the subsection with "the dealer's," and replacing "his" in the second sentence of the subsection with "the licensee's").
[2] Wilson Davis Ford, Inc., entered into a "Ford Sales and Service Agreement" on September 1, 1976, when the original 1973 agreement between Ford and Davis-Clark Ford, Inc., was amended. The original 1973 agreement provided that Wilson Davis, Sr. owned a 51 percent interest in the dealership, while Moring and Catherine Clark, as joint tenants, owned the remaining 49 percent. The original agreement also provided that Davis was the president and general manager of the dealership, while Moring Clark was the vice president. Under the amended agreement, Davis became the 100 percent equity owner of the dealership and remained president of the dealership. In accordance with several subsequent amendments to the agreement, Wade Bodiford became an executive manager and equity owner in Wilson Davis Ford. Specifically, on June 18, 1986, Wilson Davis Ford and Ford amended the agreement so that Bodiford became general manager of the dealership, while Davis remained president and 100 percent equity owner. Then, on November 9, 1987, Wilson Davis Ford and Ford amended the agreement to reflect the sale of a 20 percent interest in the corporate dealership to Bodiford.
[3] Section 320.60(11)(a), Florida Statutes (1993), provides, in pertinent part, that a "motor vehicle dealer" includes "any person, firm, or corporation who, for commission, money or other things of value, repairs or services motor vehicles or used motor vehicles pursuant to an agreement as defined in s. 320.60(1)." Section 320.60(1), Florida Statutes (1993), defines "franchise agreement," in pertinent part, as a "sales and service agreement... or any other terminology used to describe the contractual relationship between a manufacturer ... and a motor vehicle dealer, pursuant to which the motor vehicle dealer is authorized to transact business pertaining to motor vehicles of a particular linemake." Viewing the facts in the present case in conjunction with these statutory definitions, it is clear that Wilson Davis Ford is a motor vehicle dealer and that the sales and service agreement executed by and between Wilson Davis Ford and Ford is a franchise agreement. Further, as reflected in the rephrased certified question, we are concerned in this case with a corporate motor vehicle dealership, and we therefore do not address any situation involving a non-corporate motor vehicle dealership.
[4] Sometime after the termination of the stock purchase agreement at issue here, all of the stock in Wilson Davis Ford was sold to Bodiford and two other investors.
[5] We decline to address the standing and treble damages issues raised by Ford and the amici curiae arguing in support of the position taken by Ford, as those issues are outside the scope of the certified question and already have been squarely addressed by the Eleventh Circuit. See Mike Smith Pontiac, GMC, Inc. v. Mercedes-Benz of N. Am., Inc., 32 F.3d 528, 531-34 (11th Cir.1994).
[6] Manufacturers such as Ford in this case are "licensees" within the meaning of this statute. See § 320.60(8), Fla. Stat. (1993) (defining "licensee" as any person required to be licensed under section 320.61); § 320.61(1), Fla. Stat. (1993) (requiring manufacturers to be licensed).
[7] Several bills previously introduced, but not passed, in the Florida Legislature apparently attempted to address the policy concerns and arguments asserted by Ford and amici curiae supporting Ford in relation to sections 320.643(1) and 320.643(2). See Fla. HB 1635, § 2 (1997); Fla. SB 2426, § 2 (1997); Fla. HB 1525, § 3 (1995); Fla. SB 1464, § 3 (1995).
[8] This is, of course, absent constitutional implications, which have not been fully explored in this case. We decline to address the constitutional arguments raised by Ford and amici for Ford because those arguments have not been fully briefed before this Court; those arguments may properly be addressed by the Eleventh Circuit upon receipt of our answer to the rephrased certified question.