877 So.2d 680 (2004)
STATE of Florida, Petitioner,
v.
Anthony BODDEN, Respondent.
No. SC03-622.
Supreme Court of Florida.
April 15, 2004.
Rehearing Denied July 6, 2004.
*682 Charles J. Crist, Jr., Attorney General, Robert J. Krauss, Chief-Assistant Attorney General, Bureau Chief, Tampa Criminal Appeals, and Jenny Scavino Sieg, Assistant Attorney General, Tampa, FL, for Petitioner.
Eilam Isaak, Tampa, FL, for Respondent.
PARIENTE, J.
In State v. Bodden, 872 So.2d 916 (Fla. 2d DCA 2002), the Second District Court of Appeal certified the following question of great public importance:
IN ADMINISTERING FLORIDA'S IMPLIED CONSENT LAW, IS THE FLORIDA DEPARTMENT OF LAW ENFORCEMENT REQUIRED TO ADOPT RULES IN ACCORDANCE WITH THE FLORIDA ADMINISTRATIVE PROCEDURES [SIC] ACT GOVERNING THE COLLECTION, PRESERVATION, AND ANALYSIS OF URINE SAMPLES OBTAINED BY LAW ENFORCEMENT PURSUANT TO SECTION 316.1932(1)(a), FLORIDA STATUTES.[1]
Because we conclude that section 316.1932(1)(a)(1), Florida Statutes (2002), does not require that urine testing procedures be promulgated by rule in accordance with the Florida Administrative Procedure Act (APA), we answer the certified question in the negative.

FACTS AND PROCEDURAL HISTORY
This case arises out of charges that Bodden was driving under the influence in violation of section 316.193(1), Florida Statutes (2002).[2] During a traffic stop the police officer noticed that Bodden had red eyes and slurred speech, swayed while he stood, and smelled of alcohol. The officer read Bodden the implied consent warning, and Bodden agreed to a breath test and a urine test. The breath test results indicated that Bodden's blood-alcohol level was between .060 and .065 percent. The urine test results indicated the presence of a controlled substance.
Bodden filed two motions in limine requesting that the trial court suppress any reference to his urine test results because no regulatory criteria for testing had been promulgated in accordance with chapter 120, Florida Statutes (2002) (the APA). *683 Bodden argued that section 316.1932, part of the implied consent law pertaining to the operation of motor vehicles,[3] requires that any scientific test conducted pursuant to the implied consent law, including a urine test, be an approved test.[4] At the hearing on the motion, the State provided expert testimony regarding the urine testing procedures employed by the Florida Department of Law Enforcement (FDLE) Crime Laboratory in Tallahassee and verified that although FDLE procedures were adapted from published methods, FDLE's specific procedures had not been published or promulgated in accordance with the APA.
The county court judge determined that the implied consent law required that urine testing procedures be promulgated in accordance with the APA, and granted Bodden's motions to suppress. The county judge also certified to the Second District Court of Appeal the same question the Second District subsequently certified to this Court in this case  that is, whether section 316.1932(1)(a)(1) requires that urine testing procedures be approved through formal rule promulgation in accordance with the APA.[5]
The Second District answered the question in the affirmative. See Bodden, 872 So.2d at 917. According to the Second District, the sole question to be answered was whether the term "approved" in section 316.1932(1)(a)(1) refers to urine tests as well as breath and blood tests. See id. The Second District determined that the implied consent statute was an ambiguous criminal statute, and, as such, should be construed in favor of the accused. Id. Interpreting the same statute under similar factual circumstances, the Fifth District Court of Appeal in State v. Pierre, 854 So.2d 231 (Fla. 5th DCA 2003), reached a decision contrary to that of the Second District in Bodden. In Pierre, the Fifth District concluded that section 316.1932, taken as a whole, "evinces an unambiguous intent that urine tests need not be approved." See id. at 233. The Fifth District in Pierre certified conflict with Bodden. See id. at 232.[6]

ANALYSIS

A. Certified Question

The certified question presents the narrow issue of whether section 316.1932 *684 requires that procedures for the collection, preservation, and analysis of urine samples be promulgated and approved by rule in accordance with the APA. As in all cases in which we are called upon to construe a statute, we begin with the language used by the Legislature in the specific statutory provision.
Subsection (1)(a)(1) provides in pertinent part:
Any person who accepts the privilege extended by the laws of this state of operating a motor vehicle within this state is, by so operating such vehicle, deemed to have given his or her consent to submit to an approved chemical test or physical test including, but not limited to, an infrared light test of his or her breath for the purpose of determining the alcohol content of his or her blood or breath, and to a urine test for the purpose of detecting the presence of chemical substances as set forth in s. 877.111 or controlled substances....
(Emphasis supplied.)
The key to the resolution of the narrow issue we confront is whether the word "approved" in section 316.1932(1)(a)(1) modifies "urine test." An "approved" test under this provision is one that is adopted through rule promulgation in accordance with the APA. See § 120.54(3), Fla. Stat. (2003);[7]see also State v. Bender, 382 So.2d 697, 699 (Fla.1980) (recognizing that approved testing methods are those which have been adopted in compliance with the implied consent statutory provisions and the administrative rules). We have recognized *685 that one purpose of establishing uniform, approved testing methods is to "ensure reliable scientific evidence for use in future court proceedings and to protect the health of those persons being tested." Bender, 382 So.2d at 699. The results of tests that must be approved "are admissible into evidence [under the implied consent law] only upon compliance with the statutory provisions and the administrative rules enacted by its authority." Id. at 699. In this case, if "approved" modifies "urine test" then FDLE must promulgate uniform rules for urine testing in accordance with the APA, which requires a notice and public hearing. To make the determination as to whether "approved" modifies "urine test," we must engage in statutory construction.
We have explained that as a fundamental principle of statutory construction, "legislative intent is the polestar that guides the Court's inquiry." State v. Rife, 789 So.2d 288, 292 (Fla.2001) (quoting McLaughlin v. State, 721 So.2d 1170, 1172 (Fla.1998)); see also M.W. v. Davis, 756 So.2d 90, 100 (Fla.2000) (same). Legislative intent is derived primarily from the language of the statute. See Rife, 789 So.2d at 292. Thus, "it is axiomatic that in construing a statute courts must first look at the actual language used in the statute." Woodham v. Blue Cross & Blue Shield of Florida, Inc., 829 So.2d 891, 897 (Fla.2002); see also Joshua v. City of Gainesville 768 So.2d 432, 438 (Fla.2000). Applying that principle of statutory construction, we conclude, contrary to the Second District, that the language of the implied consent law provides that the methods for conducting urine tests are not required to be "approved" through APA rule promulgation.
We begin with the actual language used by the Legislature in section 316.1932(1)(a)(1). As we have explained,"[t]he legislature is presumed to know the meaning of words and the rules of grammar, and the only way the court is advised of what the legislature intends is by giving the generally accepted construction, not only to the phraseology of an act, but to the manner in which it is punctuated." Florida State Racing Comm'n v. Bourquardez, 42 So.2d 87, 88 (Fla.1949); see also State v. Hubbard, 751 So.2d 552, 562 (Fla.1999) (relying on Bourquardez for this principle of statutory construction); Beach v. Great Western Bank, 692 So.2d 146, 152 (Fla.1997) (same), aff'd sub nom. Beach v. Ocwen Fed. Bank, 523 U.S. 410, 118 S.Ct. 1408, 140 L.Ed.2d 566 (1998).
The grammatical structure of the first sentence of section 316.1932(1)(a)(1) is such that the implied consent deemed to have been given by an operator of a motor vehicle applies equally to two independent, unrelated tests  the first an "approved chemical test" to determine blood- or breath-alcohol level, and the second a urine test to determine the presence of chemical or controlled substances. The grammatical structure can be illustrated as follows:
A person who accepts the privilege extended by the laws of this state of operating a motor vehicle within this state is, by so operating such vehicle, deemed to have given his or her consent to submit
to an approved chemical test or physical test including, but not limited to, an infrared light test of his or her breath for the purpose of determining the alcoholic content of his or her blood or breath,
and
to a urine test for the purpose of detecting the presence of chemical substances as set forth in s. 877.111 or controlled substances,
*686 As is illustrated, "approved" directly modifies only "chemical test." It does not modify "urine test." In order to accept Bodden's argument that "approved" modifies "urine test," this Court would be required to insert the word "approved" between "a" and "urine," so that the implied consent created by the statute applies "to an approved urine test." This we decline to do. The plain language of this section demonstrates that "approved" does not modify "urine test."[8]
In the alternative, Bodden argues that the Legislature intended for "urine test" to fall within the subset of included approved chemical tests. However, the language of section 316.1932(1)(a)(1) in its entirety "makes a distinction between the two tests in numerous places ..., evincing that urine tests are not merely subsets of `chemical tests.'" Pierre, 854 So.2d at 233. For example, this section explicitly provides a method for urine testing:

The urine test must be incidental to a lawful arrest and administered at a detention facility or any other facility, mobile or otherwise, which is equipped to administer such tests at the request of a law enforcement officer who has reasonable cause to believe such person was driving or was in actual physical control of a motor vehicle within this state while under the influence of controlled substances. The urine test shall be administered at a detention facility or any other facility, mobile or otherwise, which is equipped to administer such tests in a reasonable manner that will ensure the accuracy of the specimen and maintain the privacy of the individual involved.
§ 316.1932(1)(a)(1). As the Fifth District recognized, if a urine test were intended to fall within the subset of chemical tests subject to rule promulgation through the APA, the language that sets forth explicit procedure for urine tests would be unnecessary. See id.
We have stated that words in a statute are not to be construed as superfluous if a reasonable construction exists that gives effect to all words. See Hechtman v. Nations Title Ins. of New York, 840 So.2d 993, 996 (Fla.2003) ("It is an elementary principle of statutory construction that significance and effect must be given to every word, phrase, sentence, and part of the statute if possible, and words in a statute should not be construed as mere surplusage."); State v. Goode, 830 So.2d 817, 824 (Fla.2002) ("[A] basic rule of statutory construction provides that the Legislature does not intend to enact useless provisions, and courts should avoid readings that would render part of a statute meaningless."). Applying that principle here, we reject Bodden's alternative construction and decline to interpret this statute in a way which would render superfluous the separate references to urine tests throughout this section.
Our interpretation that urine tests are distinct from chemical tests is borne out by a review of the remainder of section 316.1932. Although we are initially guided by the clear language of section 316.1932(1)(a)(1), we also look to the other provisions of the implied consent law to discern if there is any indication that the Legislature intended urine testing methods to be "approved." Indeed, in Mehl v. State, 632 So.2d 593, 594-95 (Fla.1993), this Court specifically recognized that provisions of the implied consent law should be read in pari materia as expressing a unified legislative purpose. See also *687 M.W., 756 So.2d at 101 ("[A]ll parts of a statute must be read together in order to achieve a consistent whole.") (quoting Forsythe v. Longboat Key Beach Erosion Control Dist., 604 So.2d 452, 455 (Fla.1992)); T.R. v. State, 677 So.2d 270, 271 (Fla.1996) (all parts of a statute must be read together so that the statute is consistent in its entirety).
Reading section 316.1932(1)(a)(1) in pari materia with the remainder of the implied consent law leads to a logical and harmonious construction in which "approved" does not modify "urine test." The implied consent law as a whole consistently treats tests relating to breath and blood distinctly from urine tests.
For example, section 316.1932(1)(a)(2) confers on FDLE the responsibility for the regulation and approval of blood and breath testing.[9] Specifically, sections 316.1932(1)(a)(2)(n) and 316.1932(1)(b)(2) *688 grant FDLE the authority to approve blood and breath testing techniques and methods, respectively.[10] Section 316.1932(1)(a)(2)(l) grants FDLE the authority to "[p]romulgate rules for the administration ... of [the] section, including definitions," and sections 316.1932(1)(a)(2)(f), (g), and (p) address FDLE's authority to "approve" operators, instruments, and repair facilities relating to breath and blood testing. Finally, sections 316.1933(2)(b)[11] and 316.1934(3)[12] both provide that chemical analysis of a person's blood and breath must be performed "substantially in accordance with methods approved by [FDLE]." Significantly, there is no mention of urine testing in any of these subsections of the implied consent law.[13] As noted by the Fourth District in Montello,"[n]owhere in Chapter 316 has the Legislature given FDLE the authority to promulgate rules for urine testing for non-commercial drivers." 872 So.2d at 615.
To construe section 316.1932(1)(a)(1) in the manner urged by Bodden would require the Court to "ignore the remainder of the statute, which, taken in its entirety, clearly conveys a contrary intent." Pierre, 854 So.2d at 233; see also Jones v. ETS of New Orleans, Inc., 793 So.2d 912, 914-15 (Fla.2001) ("A basic tenet of statutory interpretation is that a statute should be interpreted to give effect to every clause in it, and to accord meaning and harmony to all of its parts."). Accordingly, we hold that section 316.1932(1)(a), which requires that blood and breath tests be approved, does not similarly require that urine tests be approved through formal rule promulgation in accordance with the APA.[14]

*689 B. Equal Protection
We next briefly address Bodden's argument that requiring approval for blood and alcohol testing but not for urine testing violates his rights under the equal protection clauses of both the federal and state constitutions. Persons charged with DUI are not a protected or suspect class under the equal protection clauses. See Graham v. Ramani, 383 So.2d 634, 635 (Fla.1980) (holding that suspect classes are those based on alienage, nationality, or race). In the absence of a suspect classification, equal protection demands only that a classification that results in unequal treatment bear some rational relationship to a legitimate state purpose. See Duncan v. Moore, 754 So.2d 708, 712 (Fla.2000). Therefore, the State may treat those charged with DUI based on blood and breath evidence of alcohol differently from those charged because of urine test results, so long as there is a rational basis for doing so.
In this regard, we note that the goals of the breath and blood tests are different from the goals of urine testing. Breath and blood tests detect alcohol content, whereas urine tests detect controlled substances. See § 316.1932(1)(a)(1). If an individual has a certain level of alcohol in his or her system, the State benefits from the presumption of impairment. See § 316.1934. However, because there is no "legal limit" for controlled substances, there is no similar presumption associated with urine test results. A person is guilty of DUI only if the State proves that the controlled substance impaired the person's normal faculties.
We note that the testimony of the FDLE expert in this case further demonstrates the specific purpose and distinct nature of the urine test. According to the expert, unlike a breath or blood test which determines alcohol content, a level of impairment cannot be extrapolated from a drug concentration detected in a urine sample. In other words, it would be very difficult to conclude that a person was under the influence of a particular drug to the point that his or her normal faculties were impaired at the time of his or her arrest based solely on the presence of the drug in the person's urine.
Moreover, as even the Second District noted in Bodden, "the methodology for administering a urine test should be somewhat less complex than the methodology necessary for administering a breath or blood test." 872 So.2d 918. The Fifth District similarly stated in Pierre that "[t]he legislature apparently concluded that its own basic guidelines were sufficient for this rather simple test, but that more comprehensive procedures should be developed for blood testing, which is more intrusive, and breath testing, which is more complex, than urine testing." 854 So.2d at 233. Based on these distinctions, we conclude that a rational basis exists for treating the procedures for administering urine tests differently from the procedures for administering breath and blood tests and therefore reject Bodden's argument that the statute violates equal protection.

CONCLUSION
In conclusion, we hold that the implied consent law for operators of motor vehicles does not require that urine testing methods be approved in accordance with the APA. We emphasize that we do not decide whether it would be preferable for urine tests to be approved through rule promulgation. *690 Rather, we resolve this case by applying well-established principles of statutory construction to effectuate the legislative intent of the statute. See Hawkins v. Ford Motor Co., 748 So.2d 993, 1000 (Fla.1999). Accordingly, we approve the Fourth and Fifth Districts' reasoning in Montello and Pierre, answer the certified question in Bodden in the negative, and quash the Second District's decision below. We remand this case for proceedings consistent with this opinion.
It is so ordered.
ANSTEAD, C.J., and WELLS, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.
[2] Section 316.193(1), Florida Statutes (2002), provides in relevant part:

(1) A person is guilty of the offense of driving under the influence and is subject to punishment as provided in subsection (2) if the person is driving or in actual physical control of a vehicle within this state and:
(a) The person is under the influence of alcoholic beverages, any chemical substance set forth in s. 877.111, or any substance controlled under chapter 893, when affected to the extent that the person's normal faculties are impaired....
Subsection (2)(a) provides the penalties which apply to a conviction under the section. See § 316.193(2)(a).
The police also searched Bodden and found less than twenty grams of marijuana in his pocket, a marijuana pipe, and rolling papers. Consequently, he was also charged with one count of possession of cannabis in violation of section 893.13(6)(b), Florida Statutes (2002), and one count of possession of drug paraphernalia in violation of section 893.147, Florida Statutes (2002). Those charges are not at issue.
[3] The implied consent law pertaining to operation of motor vehicles encompasses sections 316.1932-.1934, Florida Statutes (2002). See Mehl v. State, 632 So.2d 593, 594 (Fla.1993).
[4] At the hearing on the motion Bodden stipulated that he submitted to a urine test and the results were positive for a controlled substance.
[5] Florida Rule of Appellate Procedure 9.030(b)(4)(A)-(B) vests discretionary jurisdiction in the district courts of appeal to review certified questions of great public importance from the county courts. Specifically, rule 9.030(b)(4) provides:

(4) Discretionary Review. District courts of appeal, in their discretion, may review by appeal
(A) final orders of the county court, otherwise appealable to the circuit court under these rules, that the county court has certified to be of great public importance;
(B) non-final orders, otherwise appealable to the circuit court under rule 9.140(c), that the county court has certified to be of great public importance.
Florida Rule of Appellate Procedure 9.160 governs the district courts' discretionary proceedings to review county court decisions.
[6] The appellee in Pierre subsequently filed notice to invoke this Court's discretionary jurisdiction based on certified conflict. See Pierre v. State, No. SC03-1691 (Fla. notice filed Sept. 22, 2003). We have stayed Pierre pending the decision in this case. More recently, the Fourth District adopted the reasoning of Pierre and certified conflict with Bodden. See State v. Montello, 867 So.2d 613 (Fla. 4th DCA 2004), notice invoking discretionary jurisdiction filed, No. SC04-512 (Fla. Mar. 25, 2004).
[7] Section 120.54(3) provides in pertinent part:

(3) Adoption procedures. 
(a) Notices. 
1. Prior to the adoption, amendment, or repeal of any rule other than an emergency rule, an agency, upon approval of the agency head, shall give notice of its intended action, setting forth a short, plain explanation of the purpose and effect of the proposed action; the full text of the proposed rule or amendment and a summary thereof; a reference to the specific rulemaking authority pursuant to which the rule is adopted; and a reference to the section or subsection of the Florida Statutes or the Laws of Florida being implemented, interpreted, or made specific. The notice shall include a summary of the agency's statement of the estimated regulatory costs, if one has been prepared, based on the factors set forth in s. 120.541(2), and a statement that any person who wishes to provide the agency with information regarding the statement of estimated regulatory costs, or to provide a proposal for a lower cost regulatory alternative as provided by s. 120.541(1), must do so in writing within 21 days after publication of the notice. The notice must state the procedure for requesting a public hearing on the proposed rule. Except when the intended action is the repeal of a rule, the notice shall include a reference both to the date on which and to the place where the notice of rule development that is required by subsection (2) appeared.
2. The notice shall be published in the Florida Administrative Weekly not less than 28 days prior to the intended action. The proposed rule shall be available for inspection and copying by the public at the time of the publication of notice.
3. The notice shall be mailed to all persons named in the proposed rule and to all persons who, at least 14 days prior to such mailing, have made requests of the agency for advance notice of its proceedings. The agency shall also give such notice as is prescribed by rule to those particular classes of persons to whom the intended action is directed.
4. The adopting agency shall file with the committee, at least 21 days prior to the proposed adoption date, a copy of each rule it proposes to adopt; a detailed written statement of the facts and circumstances justifying the proposed rule; a copy of any statement of estimated regulatory costs that has been prepared pursuant to s. 120.541; a statement of the extent to which the proposed rule relates to federal standards or rules on the same subject; and the notice required by subparagraph 1.
[8] We recognize that the Legislature drafted section 322.63, Florida Statutes (2002), which contains the implied consent law for commercial vehicles, differently than section 316.1932. However, section 322.63 is not at issue in this case, and we therefore express no opinion on whether urine tests conducted under that statute must be "approved."
[9] Section 316.1932(1)(a)(2) provides:

The Alcohol Testing Program within the Department of Law Enforcement is responsible for the regulation of the operation, inspection, and registration of breath test instruments utilized under the driving and boating under the influence provisions and related provisions located in this chapter and chapters 322 and 327. The program is responsible for the regulation of the individuals who operate, inspect, and instruct on the breath test instruments utilized in the driving and boating under the influence provisions and related provisions located in this chapter and chapters 322 and 327. The program is further responsible for the regulation of blood analysts who conduct blood testing to be utilized under the driving and boating under the influence provisions and related provisions located in this chapter and chapters 322 and 327. The program shall:
a. Establish uniform criteria for the issuance of permits to breath test operators, agency inspectors, instructors, blood analysts, and instruments.
b. Have the authority to permit breath test operators, agency inspectors, instructors, blood analysts, and instruments.
c. Have the authority to discipline and suspend, revoke, or renew the permits of breath test operators, agency inspectors, instructors, blood analysts, and instruments.
d. Establish uniform requirements for instruction and curricula for the operation and inspection of approved instruments.
e. Have the authority to specify one approved curriculum for the operation and inspection of approved instruments.
f. Establish a procedure for the approval of breath test operator and agency inspector classes.
g. Have the authority to approve or disapprove breath test instruments and accompanying paraphernalia for use pursuant to the driving and boating under the influence provisions and related provisions located in this chapter and chapters 322 and 327.
h. With the approval of the executive director of the Department of Law Enforcement, make and enter into contracts and agreements with other agencies, organizations, associations, corporations, individuals, or federal agencies as are necessary, expedient, or incidental to the performance of duties.
i. Issue final orders which include findings of fact and conclusions of law and which constitute final agency action for the purpose of chapter 120.
j. Enforce compliance with the provisions of this section through civil or administrative proceedings.
k. Make recommendations concerning any matter within the purview of this section, this chapter, chapter 322, or chapter 327.
l. Promulgate rules for the administration and implementation of this section, including definitions of terms. m. Consult and cooperate with other entities for the purpose of implementing the mandates of this section.
n. Have the authority to approve the type of blood test utilized under the driving and boating under the influence provisions and related provisions located in this chapter and chapters 322 and 327.
o. Have the authority to specify techniques and methods for breath alcohol testing and blood testing utilized under the driving and boating under the influence provisions and related provisions located in this chapter and chapters 322 and 327.
p. Have the authority to approve repair facilities for the approved breath test instruments, including the authority to set criteria for approval.
Nothing in this section shall be construed to supersede provisions in this chapter and chapters 322 and 327. The specifications in this section are derived from the power and authority previously and currently possessed by the Department of Law Enforcement and are enumerated to conform with the mandates of chapter 99-379, Laws of Florida.
(Emphasis supplied.)
[10] Section 316.1932(1)(b)(2) provides:

An analysis of a person's breath, in order to be considered valid under this section, must have been performed substantially according to methods approved by the Department of Law Enforcement. For this purpose, the department may approve satisfactory techniques or methods.
(Emphasis supplied.)
[11] Section 316.1933 addresses the right to use reasonable force when conducting blood tests for impairment or intoxication in case of death or serious bodily injury.
[12] Section 316.1934 addresses testing methods that must be employed in order for the State to benefit from the statutory presumption of impairment.
[13] We also note that the subsequent legislative history of section 316.1932(1)(a)(1) buttresses our conclusion that the Legislature did not intend for "approved" to modify "urine test." See Lowry v. Parole & Probation Comm'n, 473 So.2d 1248, 1250 (Fla.1985) ("When ... an amendment to a statute is enacted soon after controversies as to the interpretation of the original act arise, a court may consider that amendment as a legislative interpretation of the original law...."). During the 2003 legislative session, the Legislature amended section 316.1932 in order to clarify that "approved" was not intended to modify "urine testing." See Ch.2003-54, § 1, Laws of Fla. The chapter law created a new subsection (1)(a)(1)(b), dealing exclusively with urine tests, and removed any reference to urine tests in the context of discussing "approved chemical tests." See id.
[14] The test results may be admitted into evidence during trial so long as the State lays the proper common law predicate set forth in Bender, which includes a determination that the testing methods utilized are reliable. See Robertson v. State, 604 So.2d 783, 789 (Fla. 1992) (holding that when State fails to comply with administrative rules and statutory provisions governing approved testing methods, test results are admissible if State lays the common law predicate).