MAKAR, J.,
dissenting.
Florida’s susceptibility to wildfires, and the State’s role in preventing them, play central roles in this case, which involves a jury verdict of $741,496.00 for damages to privately-owned timberland arising from a certified prescribed burn on state-owned lands within Tate’s Hell State Forest. Due to highly prejudicial legal errors in the interpretation of the open burn statute, the trial was unfair and a new one warranted.
I.
A.
In the summer of 1998, the State of Florida suffered catastrophic wildfires, culminating in over half a million acres of land being burned, costing the state over $130 million. Governor Chiles declared a statewide emergency due to the “extraordinary fire conditions, recent and continuing fires, and the potential for more fires.” Fla. Exec. Order No. 98-165 (Jun. 25, 1998). At its next session, the legislature — based upon its legislative findings and purposes[1] — made broad statutory changes including the adoption of an open *916 burn statute — entitled “Open burning authorized by the Florida Forest Service”— that allowed for noncertified and certified prescribed burns, the latter’s use to be encouraged on a more widespread and frequent basis to reduce wildfire risks. See Ch. 99-292, Laws of Fla.; see also Fla. H.R. Comm, on Agrie., HB 1535 (1999) Staff Analysis 1 (Jun. 15, 1999). In doing so, the legislature exhorted the state forestry service to “maximize the opportunities for prescribed burning” via the new protocols and standards the new law established. It empowered the Florida Division of Forestry to conduct burns on any area within the state that was “reasonably determined to be in danger of wildfire.” § 590.125(4), Fla. Stat. Due to the threat of fire-related lawsuits, the legislature modified liability for damages or injuries resulting from prescribed burns “unless gross negligence is proven.” See § 590.125(3)(b)-(c), Fla. Stat. (“Neither a property owner nor his or her agent is liable ... for damage or injury caused by the fire or resulting smoke ... for burns conducted in accordance with this subsection unless gross negligence is proven.”).[2] With this backdrop in mind, we turn now to the prescribed burn at issue.
B.
Tate’s Hell State Forest is a single parcel of state-owned land in Florida’s panhandle comprising over 202,000 acres. It is called Tate’s Hell for a reason: portions of it are desolate and perilous swamplands. The tract known as Tate’s Hell Swamp has longstanding lore for its namesake, attributed to the travails of Mr. Tate who barely survived a week-long foray into the mire’s perils.[3] Portions of the area in and around *917 Tate’s Hell were altered to allow for pine forestation in the 1960-70s, which continues to this day.
The Division of Forestry is responsible for managing Tate’s Hell State Forest, which includes property owned by the Board of Trustees of the Internal Improvement Trust Fund. In 2008, the Division’s annual remedial goal was to burn about 40,000-50,000 acres of the Forest’s acreage. To do so, the Division obtained the necessary approvals to conduct a two-day certified prescribed burn of 3,267 acres in the Forest, the designated area termed the “prescribed burn area.” Prior to the initiation of the burn, the Division created a burn plan prescription[4] describing the targeted burn area, documenting what would be burned and why, specifying how to conduct the burn, identifying the authorization date and time period for the burn, and describing how the area would look afterwards. The Division also surveyed the area to ensure adequate firebreaks existed around the burn site.
On the first day of the scheduled two-day burn, the Division’s burn dispatch[5] determined that conditions were favorable for the burn, which involved consideration of the burn’s location, existing weather conditions, the amount of acreage, and other factors. After receiving authorization from dispatch, Certified Prescribed Burn Manager[6] (CPBM) Joseph Taranto lit a test fire and determined it was ready to go. The burn crew then lit a thirty-foot baseline around the entire burn area, and used a helicopter to drop small spheres, known as “ping-pong balls,” containing chemicals • designed to create small fires upon impact with the ground. All went well the first day. After stopping the flames and determining they were not spreading, Taranto released his crew for the day. The second day of the burn was a repeat of the first; all went according to plan. Taranto again evaluated the weather and wind, called dispatch for authorization, and followed the same procedure as day one, ensuring that the flames were stopped and not spreading before releasing the crew.
After the two-day certified burn was complete, the Division’s crews thereafter checked the burn area once or twice daily, ensuring no more smoke, heat, or fires existed. It used monitoring and “mopping up” activities designed to encircle the perimeter of the fire using different tools such as water, shovels, or rakes along the edges of the burn area. Mopping up increases the buffer area and is usually accomplished by a predetermined distance. *918 The Division continued its twice-daily regimen until May 23, 2008, when a heavy rainstorm “fully extinguished” whatever remaining smoldering embers existed.
During the forty-five day period while the burn smoldered, three “spotovers” occurred. In contrast to flames spreading within a certified burn area, a spotover occurs when a live ember from the prescribed burn area is picked up by winds and cast onto adjoining property, causing a separate fire, usually due to unexpected changes in weather or wind direction. The first two spotovers, dubbed “High Bluff’ and “High Bluff 2,” occurred on April 21st and May 6th, both crossing over the twenty-five to fifty feet of pavement of Highway 65 that formed the eastern edge of the prescribed burn area. In each case, the spotover went onto another part of the Division’s own property and was contained.
The third spotover, which spawned this lawsuit, occurred on May 13th — a month after the initial two-day burn period — on the far west side of the prescribed burn area. On that day, cinders apparently were elevated and blown westward across a continuous water body at the headwaters of Apalachicola Bay known as Cash Creek, igniting on a portion of the 2,182 acres of timberland owned by Shuler Limited Partnership (Shuler LP), also known as Shu-ler’s Pasture. To cross Cash Creek, this spotover had to jump between 800 to 1300 feet across the headwaters, which had been designated as a natural firebreak between the Shuler’s Pasture on the west and the certified burn area on the east (see Appendix).
Once Division officials verified that smoke was coming from Shuler’s Pasture, they initiated a response. Division officials and firefighters determined the fire was fast-moving and that the affected area was thick with old-growth timber including a marshy bog that had not been burned in “several years.” Because the Shuler LP property had only small trails meant for four-wheelers, attempts were made to cut several new roads to access the fire. These efforts proved fruitless, the crew ultimately concluding they could not stop the fire. The fire ultimately destroyed timber on 835 acres of Shuler’s Pasture; no injury or other damage occurred.
C.
In its ensuing complaint against the Department, the Division, and the Board (which will be called the Division unless a distinction is necessary), Shuler LP originally alleged claims based on negligence, violations of section 590.13, Florida Statutes,[7] negligence per se, and strict liability. The Division moved to dismiss, in part, because claims other than gross negligence were impermissible based upon the 1999 amendments, which sought to encourage certified burns by raising the standard for liability to gross negligence. Shuler LP countered that the gross negligence standard did not apply unless a certified prescribed burn was “conducted in accordance with” the statutory criteria, which it interpreted to create jury questions as to whether the Division adequately complied with the criteria during the course of the entire burn period; if so, a gross negligence standard applied; if not, other negligence-based claims were permissible. Without elaboration, the trial court denied the motion to dismiss as to the negligence, statutory violations, and negligence per se claims, but granted it as to the strict liability count. Shuler LP subsequently filed an amended complaint that replaced the *919 strict liability claim with one for gross negligence.
Concurrently, the Division unsuccessfully sought rulings on the meaning of statutory terminology defined or used in the burn statute, section 590.125. It sought relief from a portion of a stipulation, and to amend its answer to correct an inaccuracy regarding the use of the term “extinguished”[8] as statutorily defined; it was denied by the trial court. The Division also sought a ruling that the statutory requirement that a CPBM be present at the site “from ignition of the burn to its completion”,[9] meant that the manager had to be present until the ignition phase was complete and the fire was statutorily “extinguished” (i.e., no spreading flames exist); the trial court denied this request as well. As to both statutory interpretation issues, the trial court prohibited any testimony inconsistent with her rulings and prevented the testimony of Division officials who interpreted and applied the statute differently in the course of their duties. The result was that, over the Division’s objections, the jury was read a stipulation saying the Division agreed that it failed to “extinguish” the fire for forty-five days and failed to have a CPBM on site as the statute required. These rulings on the statutory meanings of key phrases became central to the jury’s understanding of the case.
After presentation of the evidence at a seven-day trial, the jury was instructed that its determination of the Division’s liability was based on whether the Division had failed to comply with one or more of the following provisions of Chapter 590.125(3)(b), Florida Statutes:[10]
• a written prescription be prepared before receiving authorization to burn from the Division of Forestry;
• that a CPBM be present on-site with a copy of the prescription from ignition of the burn to completion of the burn;
• that there are adequate firebreaks at the burn site; and
• that there are sufficient personnel and firefighting equipment for the control of the fire.
The jury concluded that the Division violated at least one of these four provisions at some point in the forty-five days prior to smoldering being fully complete, thereby making it potentially liable under the *920 negligence, statutory violation, and negligence per se theories; the jury concluded that the Division was liable under each of these theories and was also liable for gross negligence. It awarded damages and the Division now appeals.
II.
The Division claims a number of interrelated legal rulings interpreting the open burn statute resulted in an unfair trial in which the jury was misled about what legal standards applied as well as what evidence it could consider and what inferences it could draw; it also claims that whatever negligence was shown did not arise to “gross negligence” on this record and that the Cash Creek spotover was unforeseeable thereby justifying reversal.
A.
Before considering these issues, the narrow factual context of this case bears emphasis. Shorn to its core, Shuler LP’s theory was that the Division should have foreseen the Cash Creek spotover and taken actions to have prevented it from the outset of the certified prescribed burn. They do not dispute that controlled burns are necessary, that the Tate Forest certified burn was handled correctly through the two-day ignition phase (discussed below),[11] or that certain types of spotovers, such as those crossing the adjacent highway, are expected to happen. Instead, their legal theories focused on the time period after the two-day prescribed burn was complete, the burn site was smoldering, and monitoring and mop up efforts were ongoing. It is during this timeframe that they claim the Division acted wrongfully and should be subject to liability. With this important distinction in mind, we turn to legal errors the Division claims were prejudicial and what effect they had individually and cumulatively on the fairness of the trial.
B. The Open Bum Statute (Circa 2008)
The Division contends the trial court erred by misinterpreting the open burn statute to allow claims other than gross negligence; to preclude it from arguing that CPBMs were not legally required to be on-site beyond the initial burn period; and to disallow it from using the statutory definition of “extinguished” in its defense.[12]
1. Whether Section 590.125 Allows Claims other than “Gross Negligence” for Certified Bums Done in Accordance with the Statute.
On the first issue, the Division claims it was error for the trial court to deny its motion to dismiss Shuler LP’s allegations of negligence, statutory violations, and negligence per se. The statute at issue states that “[njeither a property owner nor his or her agent is liable ... for damage or injury caused by the fire or resulting smoke ... for burns conducted in accordance with this subsection unless gross negligence is proven.” § 590.125(3)(b)-(c), Fla. Stat. Shuler LP claims the “in accordance with” language means a property owner must first have complied in all respects for conducting a certified prescribed burn from the start of a burn until it is fully extinguished (the forty-five days). The Division argues that the gross negligence standard applies if the certified prescribed burn is conducted via the method specified in the statute; it points out that *921 the legislature considered but rejected a lesser negligence standard; and it also argues that the legislative purpose of shielding property owners from liability would be thwarted under Shuler LP’s approach.
Though no Florida appellate court has interpreted this portion of the open burn statute since its enactment in 1999, guidance is not entirely lacking. Our northern neighbor, Georgia, has a similar burn statute. See OCGA § 12-6-148.[13] It provides that a landowner who conducts a prescribed burn in compliance with the statute, cannot be held liable for damages or injuries caused by fire or smoke or for creating a nuisance unless it is proven that he was grossly negligent in starting, controlling, or completing the burn. Id.
As is the case with its Florida counterpart, the history of section 12-6-148 reveals that the Georgia legislature, recognizing that prescribed burning was decreasing due to liability concerns and nuisance complaints, sought to make prescribed burns more attractive as means of managing fuels, reducing the threat of wildfires, and lessening the threat of loss of life and property to the state’s increasing human population. See OCGA § 12 — 6—146(a)(1)—(5). In 2000 it did so by elevating the liability standard to gross negligence. See OCGA §§ 12-6-146, 12 — 6—148(b). Two Georgia cases recently interpreted the statute.
In the first, Morgan v. Horton, 308 Ga.App. 192, 707 S.E.2d 144 (2011), a Georgia appellate addressed the following question, which was one of first impression:
If the undisputed evidence shows that a landowner obtained a permit from the Forestry Commission to conduct a prescribed burn[ ] on his property, followed the directions of the ranger in charge of supervising the burn, arranged for the ranger to be onsite to monitor the burn, and, according to the ranger, properly conducted the prescribed burn, is the landowner entitled as a matter of law to the protections of OCGA § 12-6-148,[] which provides that a landowner who conducts a prescribed burn in compliance with the statute cannot be held liable for damages or injuries caused by fire or smoke, or for creating a nuisance, unless it is proven that he was grossly negligent in starting, controlling or completing the burn?
Id. at 147. Answering the question in the affirmative, the court held that a landowner was entitled to the protection of the statute unless he exhibited gross negligence in starting, controlling, or completing the burn. Id. at 149. The facts were that the plaintiffs alleged the defendant improperly conducted a prescribed burn *922 on his property, where smoke from the burn, combined with heavy fog, severely limited visibility on an adjacent highway, resulting in the decedent’s fatal collision with a tractor-trailer. Id. at 147-48. But the undisputed evidence showed that the landowner had obtained a permit from the Forestry Commission to conduct the prescribed burn on his property, followed the directions of the ranger in charge of supervising the burn, and according to the ranger, properly conducted the prescribed burn. Id. In other words, the landowner complied with the requirements of the burn statute. The court rejected the plaintiffs claim that section 12-6-148 required the ranger to be on site without leaving, finding that the statute did not require the ranger to be “continually present” at the site or prohibit him from leaving the site when the burn was under control. Id. at 149. Under the circumstances, the appellate court concluded, the landowner was entitled, as a matter of law, to the protections of section 12-6-148. Id.
A year later, in a similar case, Wolfe v. Carter, 314 Ga.App. 854, 726 S.E.2d 122 (2012), the Georgia appellate court, relying on Morgan, held that the appellant was required to prove gross negligence to establish liability. 726 S.E.2d at 126-27. Wolfe was injured in a three-car collision on a smoke-filled highway and claimed that the prescribed burner did not comply with the statute’s requirement that he remain present on site until the fire was adequately confined. Id. at 126. The court rejected the argument, further holding that there was no evidence from which a jury could infer gross negligence, reasoning that “[e]ven if we were to assume, without deciding, that the evidence raised a jury issue as to whether [the prescribed burn manager’s] actions were negligent, we find no evidence from which a jury could reasonably conclude that [he] failed to exercise even slight care and was therefore grossly negligent.” Id.
Though only persuasive, the rationales of the Georgia courts support the conclusion that it was error to subject a Florida property owner or its agent, here the Division, to a standard of liability other than gross negligence where the evidence shows the certified burn was done “in accordance with” section 590.125. The record establishes that the Division fully complied with all statutory requirements for the prescribed burn as outlined in the prescription plan, which set forth the criteria for “starting, controlling, and extinguishing a prescribed burn.” The fire was ignited, contained, and statutorily “extinguished” by the second day, followed thereafter by monitoring and mop up activities. Shuler LP does not take issue with the Division’s handling of the burn in the two-day prescribed burn period; instead, it takes issue with what happened after the burn had been initially contained/controiled when the Cash Creek spotover occurred. Much like the private property owners in the Georgia cases, the Division complied with the requirements of the prescription as written and approved.
That atmospheric conditions subsequently intervened (reduced wind in the Georgia cases, resulting in lost visibility and highway accidents or, as in this case, increased winds, resulting in the trans-inlet spot-over) does not lessen the legislative intent that burns conducted “in accordance with” the subsection of the certified burn statute at issue were to be adjudged under a gross negligence standard. Any other interpretation renders the gross negligence standard illusory. For example, a prescription plan that is prepared, approved and then implemented in accordance with pre-ignition standards and protocols would provide little or no shield against liability if a jury can adjudge them as inadequate for failing to foresee weather-related events occurring post-ignition. Modern weather forecasting has become less art and more *923 science, but it has its limitations, particularly in Florida, where Mark Twain’s adage “if you don’t like the weather, wait a minute” holds sway. As such, the “adequacy” of a prescription plan’s designation of “firebreaks at the burn site” must be according to pre-ignition predictions and guideposts; the “sufficiency” of a prescription plan’s designation of “personnel and firefighting equipment for the control of the fire” is to be adjudged likewise. To impose a lesser standard of tort liability after-the-fact based on unpredicted weather events, even though a property owner or agent has complied with the terms of a prescription plan, thwarts the legislative purpose of the certified burn statute.
This point is made in recent commentary, noting that the legislative purpose underlying the gross negligence standard in the certified burn statute hinges on whether requirements such as “adequate” firebreaks and “sufficient” personnel are adjudged on “pre-ignition predicted weather conditions and fire behavior” or those arising post-ignition. Stephen McCullers, A Dangerous Servant and A Fearful Master: Why Florida’s Prescribed Fire Statute Should Be Amended, 65 Fla. L. Rev. 587, 611 (2013) (“This prescription will include a description of the predicted fire behavior, how the fire will be ignited and controlled, and what personnel and equipment will be available.”). The commentator notes that this portion of the statute “can be interpreted to mean that any fire escape or smoke damage is per se evidence that the practitioner did not follow the statutory requirements of having sufficient personnel, fire breaks, and equipment to control the fire.” Id. at 593 (noting lack of statutory definitions that might provide greater clarity). “Fire practitioners are afraid that any accident will be per se proof that” they violated these requirements, a concern borne out in this litigation. Further, because prescription plans account for such factors based on a detailed pre-ignition basis, uncertainty and ambiguity are created if liability standards are based on unpredicted weather or fire events post-ignition. The legislature could not have intended the certified burn statute to be self-defeating in these many ways.[14]
That the Division complied with the prescription plan, as written, means that a gross negligence standard applied to its post-ignition conduct. Shuler LP says that even under a gross negligence standard, affirmance is required because the jury ruled for them on this count. But that argument assumes that the jury was properly instructed and informed as to not only the pre-/post-ignition distinction just discussed, but also as to what evidence it could consider in light of the statutory definitions at play in this type of case. Even if the jury was properly instructed on this former distinction (it was not), erroneous legal rulings by the trial judge severely limited the Division’s ability to defend its actions, constituting grounds for reversal, even under a gross negligence standard. The next sections address two such errors, both of which formed the primary focus of the jury instructions and Shuler LP’s closing argument to the jury.
2. Prohibiting the Use of the Statutory Definition of “Extinguished” Was Erroneous And Prejudicial.
A critical aspect at trial was understanding when the fire was deemed to be “extinguished,” a term that has a specific definition in the open burn statute but also has a number of non-statutory meanings. The Division had initially admitted to a para *924 graph in the second amended complaint, which stated:
On May 28, 2008, a day when the Prescribed Burn Area received approximately three inches of rainfall, the Prescribed Burn was finally extinguished. The prescribed Burn had smoldered for approximately six weeks and caused several wildfires after it was ignited by Defendant Division of Forestry and its employees on April 9, 2008.
(Emphasis added). As discovery progressed, however, the evidence demonstrated that, although the burn may not have been “finally extinguished” until May 23, 2008 in the layman’s meaning of that phrase, it was “extinguished” within the meaning of section § 590.125(1)(d), which defines “extinguished” for certified prescribed burns as “no spreading flame.”[15]
As a result, the Division moved to amend its answer to the corresponding portion of Shuler LP’s amended complaint to state as follows:
Denied as phrased, admitted that the prescribed burn area received approximately three inches of rain on May 23, 2008 and that parts of the prescribed burn area had smoldered for approximately six weeks.
It also sought to withdraw a portion of the stipulated facts that related to the “finally extinguished” portion. Absent the requested amendment, and a change to the corresponding stipulated facts, the Division’s defense would be laboring under a legally incorrect interpretation of the statute and a stipulation. That is what happened here, when the erroneous stipulation — that the Division failed to “extinguish” the fire for over six weeks until heavy rainfall finally put it out — was read to the jury, despite the evidence that showed the Division had extinguished the prescription after the second day of the burn.
Rather than allowing amendment, the trial court rejected the Division’s request, saying it was too close to trial to allow the requested changes. And while Shuler LP claimed that it would have been prejudiced, the record does not support this claim. It was prepared to show that the fire smoldered for six weeks and stopped doing so after a heavy May 23rd rainfall; and having to present one’s case using legally correct statutory definitions is not prejudicial under these circumstances. Moreover, the trial court allowed Shuler LP to modify its pleadings, but concurrently denied the Division’s request to amend its papers to conform to the statutory definition and the discovery obtained.
While Shuler was not prejudiced, the same could not be said of the Division, which was stymied by the trial judge’s ruling, preventing the Division from arguing what the statute requires. For example, at the trial a fire fighter attempted to testify on behalf of the Division that “no spreading flames” existed, which meant the fire was “extinguished” for statutory purposes — even though smoldering may have continued within the monitored confines of the prescribed burn area. Use of the statutory definition would have allowed the Division to show the certified prescribed burn was conducted in accordance with the statute, undercutting claims it was negligent or grossly so.
Indeed, the evidence showed, and Shuler LP conceded, that the Division had “extin *925 guished” the fire at the end of the two-day initial burn period in the prescription, April 9th and 10th. In closing argument, Shuler LP repeatedly said it was “not contending” that the Division had inadequate personnel, fire breaks, equipment, or “otherwise” on these two days. Instead, Shuler LP’s theory was that the Division “didn’t do anything” to “extinguish” the smoldering in the forty-three day monitor/mop up period except “pray for rain,” which was inaccurate, but capitalized on the erroneous legal rulings by saying the Division committed a number of “statutory violations” because it (a) “didn’t have a plan” in the prescription for “extinguishing the fire” arising from the Cash Creek spot-over; (b) burned more acreage than allowed in the prescription (due to the spot-over), (c) exceeded the authorized “two day” certified burn plan by allowing smoldering for forty-five days before the fire was fully “extinguished” (“Forty-three days they did not have an authorization to burn”), and (d) failed to have a CPBM on site for the forty-five days) (discussed in the next section). Because of the trial court’s incorrect ruling, the jury was erroneously told and led to believe that the Division continually violated the statute by failing to have “extinguished” the fire during the forty-five day period, when in fact the certified prescribed burn was deemed extinguished because its flames were not spreading with monitoring and “mopping up” ongoing. Under any theory of liability, this erroneous legal ruling was highly prejudicial to the Division, and contributed, in part, to the next statutory interpretation error as well.
3. When CPBMs Must Be Present.
In a related issue, the Division claims error in the trial court’s pre-trial ruling that the open burn statute required the Division to have a CPBM continually on-site from April 9th until the burn was “finally extinguished.” If incorrect, this ruling was extremely prejudicial to the Division because it allowed the jury to be instructed that the Division’s failure to have CPBMs on-site at all times was an ongoing violation of the open burn statute, providing the Division with no defense whatsoever for not having done so.- The statute at issue states:
[certified prescribed burning m]ay be accomplished only when a certified- prescribed burn manager is present on site with a copy of the prescription from ignition of the bum to its completion.
Id. § 590.125(3)(b)1., Fla. Stat. (emphasis supplied). The interpretative dispute focused on whether the word “completion” refers to “ignition” or to the “burn.” Shu-ler LP argued the term “completion” referred to the “burn” and thereby required CPBMs to be onsite until “completion” of the “burn” — i.e., CPBMs had to be present each and every day until the prescribed burn was completely and totally out, not merely extinguished (which statutorily meant that no spreading flames were present).
The Division argued that the word “completion” referred to the “ignition,” meaning that CPBMs need only be present at the burn site with a copy of the prescription during the two-day initial ignition period when the fire was activated but then extinguished (i.e., no spreading flames). Consistent with its interpretation, the Division agreed pre-trial that a CPBM was onsite for only the two-day initial ignition period.
In support of its position, the Division presented two experts. The first, James Karels, was the Director of the Florida Forest Service, responsible for the oversight of the entire state forest system, including prescribed burns. He also chairs the Fire Committee representing all fifty states for fire management, sits on a number of national fire councils, had been a CPBM in Florida for over twenty-five *926 years, and had participated in hundreds of certified prescription burns. Beyond his knowledge of and experience in applying the open burn statute in conducting certified burns, he was involved in drafting the extensive rewrite of the statute in 1999 and its subsequent amendments. The second expert was Kenneth Weber, a twenty-five year CPBM, who has supervised “several hundred” burns each year and is the district manager of field operation of the Florida Forest Service in six counties, including Franklin County, where the burn at issue took place.
Mr. Karels testified that the phrase “to its completion” meant that the “burn manager [must be] on site with a plan [until] completion of the ignition, completion of their burn plan during that authorization period.” In his view, a CPBM need not be on site until all smoldering embers were completely out. Instead, once the ignition period is complete and the fire contained within the prescribed burn area (i.e., no spreading flames), smoldering and smoke continues, which is monitored and “mopped up” on an ongoing daily basis by crew members. These activities during the monitoring and mop-up period do not need authorization; a CPBM may be actively involved in them, but is not required to be “on site with a copy of the prescription.” In his professional view, the “[c]om-pletion of the burn is completion of the ignition and completion of [the] prescription” not the completion of the burn overall. On this point, Mr. Weber testified that during prescribed burns, the CPBM periodically calls in to report progress during the two-day ignition phase (as happened here). For example, CPBM Taran-to informed the dispatcher at various times during ignition that the process was “20 percent complete”, “40 percent complete”, “75 percent complete,” and so on. Taran-to’s reports on how close the team was to “completion” of the prescription plan in this initial phase is entirely consistent with the statutory meaning of “completion” the Division advocated.
Shuler LP put on no expert testimony. Instead, over objection, it was allowed to call Mr. Michael Shuler, the party-plaintiff, who testified he was an attorney and opined that “it is very clearly the intention of the Legislature that the word [i.e., “completion”] would mean that you’d have to have ... a certified burn manager on site with the prescription.”
The trial court ultimately excluded the Division’s experts’ testimony, allowed Mr. Shuler’s testimony, and ruled consistently with Shuler LP’s interpretation of the statute. It prohibited the Division’s witness from testifying at trial “that the statute means anything different” than what she had ruled (i.e., that a CPBM had to be on-site until the burn “completion” on May 23rd). This ruling went to the heart of the Division’s case, precluding testimony the jury would deem highly relevant in deciding whether the Division complied with the statute or acted neglectfully. Perhaps most damaging, it allowed the jury to be told the Division had “stipulated” that it violated the statute daily by not having a CPBM onsite after the burn was initially contained. Shuler LP, again capitalizing on the legal error, read the Division’s stipulation that a CPBM was on site “on April 9th and 10th only, but not between April 11th and May 23rd.... That’s a clear violation of [section 590.125(3)(b)l., Fla. Stat. (b)(1) ].”
The trial court erred in rejecting the Division’s interpretation of its own statute, and allowing the jury to hear only the testimony of Mr. Shuler. The only competent evidence on the topic was from the *927 Division. Rather than hearing from the trained officials who understand, implement and had involvement in drafting the statute, the jury heard only from the property owner, who — although a lawyer — had no background or expertise in the burn statute or its applicability whatsoever.
Simply because this is a tort case does not nullify the Division’s expertise on the topic nor negate deference to the Division’s interpretation of a statute related to the Division’s regulatory functions. See, e.g., Health Options, Inc. v. Agency for Health Care Admin., 889 So.2d 849, 851 n. 2 (Fla. 1st DCA 2004) (deference to agency’s construction of a statute is not required if the statute is “unrelated to the regulatory functions of the agency.”) (citing Chiles v. Dep’t of State, Div. of Elec., 711 So.2d 151, 155 (Fla. 1st DCA 1998) (“[Cjourts are not required to defer to an agency’s interpretation of a statute if the statute is unrelated to the functions of the agency.”) (emphasis added)). Here, the entire case centered on the Division’s regulatory functions, requiring deference to the Division’s interpretation.
And the Division’s interpretation is fully consistent with the 1999 amendments— when “extinguished” was defined for the first time — which indicates the Legislature intended for CPBMs to remain on site only until “completion” of the ignition of burns. See § 590.125(1)(d); Fla. H.R. Comm, on Agrie., HB 1535 (1999) Staff Analysis 3 (June 15, 1999). Moreover, the legislature used that term to make clear that in the cases of non certified, burns — which are not at issue here — there must be “[s]ome-one present at the burn site until the fire is extinguished.” §§ 590.125(1)(d), 590.125(2)(a)5., Fla. Stat. In contrast, there is no such requirement for certified burns. Rather, the statute relating to certified burns states only that the CPBM must be present on site with a copy of the prescription from ignition of the burn to its completion, a term that is not statutorily defined. Instead, it is an industry term used to refer to the prescribed fire’s ignition as the Division’s expert testimony revealed. That the legislature defined one term in one section and did not define another in the next section, is something this Court must presume was done intentionally. See State v. Bodden, 877 So.2d 680, 685 (Fla.2004) (“[t]he legislature is presumed to know the meaning of words and the rules of grammar.”). Had the legislature intended that a CPBM remain on site until a fire is completely out, it would have said so.[16]
As such, it was error for the trial court not to defer to the Division’s interpretation of its own statute and to prohibit the testimony of its experts in this regard, which went to the heart of the case against it, particularly where the Division’s opinion testimony came from persons with such specialized knowledge of industry practice. See, e.g., State v. Sercey, 825 So.2d 959, 977 (Fla. 1st DCA 2002) (reasoning that expert testimony of those with specialized knowledge in a particular field is admissible if applicable to the evidence at trial).
*928 Disallowing the Division’s testimony on this issue was error, which was highly prejudicial. This misinterpretation of the statute was directly related to whether the Division violated the statute and was negligent as a result. See Witham v. Sheehan Pipeline Const. Co., 45 So.3d 105, 109 (Fla. 1st DCA 2010). As the record reflects, the jury was told the Division violated the statute by not having a CPBM on site, an error akin to saying a defendant-surgeon summarily left the operating room without suturing the wound and merely “prayed” for it to heal.
III.
In sum, the cumulative effect of three statutory interpretation errors resulted in the Division being denied a fair opportunity to defend itself under the correct legal standards, thereby warranting reversal and a new trial.

APPENDIX

[[Image here]]

. Its legislative findings and purpose for certified prescribed burning stated:
(a) The application of prescribed burning is a land management tool that benefits the safety of the public, the environment, and the economy of the state. The Legislature finds that:
1. Prescribed burning reduces vegetative fuels within wild land areas. Reduction of the fuel load reduces the risk and severity of *916 wildfire, thereby reducing the threat of loss of life and property, particularly in urban areas.
2. Most of Florida’s natural communities require periodic fire for maintenance of their ecological integrity. Prescribed burning is essential to the perpetuation, restoration, and management of many plant and animal communities. Significant loss of the state’s biological diversity will occur if fire is excluded from fire-dependent systems.
3. Forestland and rangeland constitute significant economic, biological, and aesthetic resources of statewide importance. Prescribed burning on forestland prepares sites for reforestation, removes undesirable competing vegetation, expedites nutrient cycling, and controls or eliminates certain forest pathogens. On rangeland, prescribed burning improves the quality and quantity of herbaceous vegetation necessary for livestock production.
4. The state purchased hundreds of thousands of acres of land for parks, preserves, wildlife management areas, forests, and other public purposes. The use of prescribed burning for management of public lands is essential to maintain the specific resource values for which these lands were acquired.
5. A public education program is necessary to make citizens and visitors aware of the public safety, resource, and economic benefits of prescribed burning.
6. Proper training in the use of prescribed burning is necessary to ensure maximum benefits and protection for the public.
7. As Florida’s population continues to grow, pressures from liability issues and nuisance complaints inhibit the use of prescribed burning. Therefore, the Florida Forest Service is urged to maximize the opportunities for prescribed burning conducted during its daytime and nighttime authorization process.
Ch. 99-292, Laws of Fla. § 9 (codified in newly-established § 590.125, Fla. Stat. (1999)).

. Earlier drafts of the proposed amendments allowed for liability when a lesser degree of negligence was proven, but only gross negligence appears in the final version of the bill.

. The Department's website recounts the story:
Local legend has it that a farmer by the name of Cebe Tate, armed with only a shotgun and accompanied by his hunting dogs, journeyed into the swamp in search of a panther that was killing his livestock. Although there are several versions of this *917 story, the most common describes Tate as being lost in the swamp for seven days and nights, bitten by a snake, and drinking from the murky waters to curb his thirst. Finally he came to a clearing near Carrabelle, living only long enough to murmur the words, ‘My name is Cebe Tate, and I just came from Hell!' Cebe Tate’s adventure took place in 1875 and ever since, the area has been known as Tate’s Hell, the legendary and forbidden swamp.
Fla. Dep’t of Agrie. & Consumer Servs., The Legend of TATE’S HELL..., http://www.fresh fromflorida.com/Divisions-Offices/Florida-ForestService/Our-Forests/State-Forests/Tate-s-Hell-State-Forest.

.Id. 590.125(l)(c) ("‘Prescription’ means a written plan establishing the criteria necessary for. starting, controlling, and extinguishing a prescribed burn."); 51-2.006, Fla. Admin Code (2005).

. Dispatch is based in Tallahassee and issues authorization to conduct the bum. After all the relevant information is provided to the dispatcher, he or she enters it into a computer program, which helps to determine whether the conditions are favorable for a bum.

. § 590.125(l)(b), Fla. Stat. (2008) ("‘Certified prescribed burn manager’ means an individual who successfully completes the certification program of the division and possesses a valid certification number.").

. § 590.13, Fla. Stat. (2007) (“Any person violating any of the provisions of this chapter shall be liable for all damages caused by such violation, which damages shall be recoverable in any court of competent jurisdiction. The civil liability attaches whether or not there is criminal prosecution and conviction.”).

. See § 590.125(1)(d), Fla. Stat. (" ‘Extinguished’ means no spreading flame for ... certified prescribed burning ... existfs]”) (emphasis added).

. Id. § 590.125(3)(b)(1) ("[certified prescribed burning m]ay be accomplished only when a certified prescribed burn manager is present on site with a copy of the prescription from ignition of the hum to its completion.”) (Emphasis added)

. In full, the statute provided:
(b) Certified prescribed burning pertains only to broadcast burning. It must be conducted in accordance with this subsection and:
1.May be accomplished only when a certified prescribed burn manager is present on site with a copy of the prescription from ignition of the burn to its completion.
2. Requires that a written prescription be prepared before receiving authorization to burn from the division.
3. Requires that the specific consent of the landowner or his or her designee be obtained before requesting an authorization.
4. Requires that an authorization to burn be obtained from the division before igniting the burn.
5. Requires that there be adequate firebreaks at the burn site and sufficient personnel and firefighting equipment for the control of the fire.
6. Is considered to be in the public interest and does not constitute a public or private nuisance when conducted under applicable state air pollution statutes and rules.
7. Is considered to be a property right of the property owner if vegetative fuels are burned as required in this subsection.

. Although Shuler LP argues on appeal that the way the Division conducted the burn during the two-day ignition period was negligent, they specifically contended die opposite below, saying everything the Division did was "appropriate.” They emphasized this point, saying "we’re not contending they did anything insufficient with personnel or firebreaks or anything else.” (emphasis added).

. The Division also raised issues of sovereign immunity and foreseeability, which need not be addressed.

. This section provides:
§ 12-6-148. Requirements for burning; liability for damages
(a) Prescribed burning conducted under the requirements of this part shall:
(1) Be accomplished only when an individual with previous prescribed burning experience or training is in charge of the burn and is present on site until the fire is adequately confined to reasonably prevent escape of the fire from the area intended to be burned;
(2) Be considered in the public interest and shall not create a public or private nuisance;
(3) Be considered a property right of the landowner; and
(4) Be conducted in accordance with a permit issued under Part 3 of this article.
(b) No property owner or owner’s agent conducting an authorized prescribed bum under this part shall be liable for damages or injury caused by fire or resulting smoke unless it is proven that there was gross negligence in starting, controlling, or completing the burn.
OCGA § 12-6-148.

. The open bum statute applies a general civil liability standard for non-certified bums, § 590.13, further supporting the conclusion that certified prescribed burns are subject to another standard, i.e., gross negligence.

. § 590.125(1)(d), Fla. Stat. (2008) (" ‘Extinguished’ means that no spreading flame for wild land burning or certified prescribed burning, and no visible flame, smoke, or emissions for vegetative land-clearing debris burning, exist.”). The statute was amended in 2001 to provide essentially the same definition. Id. § 590.125(1)(c) (2011) ("'Extinguished1 means that for: ... 1. Wildland burning or certified prescribed burning, no spreading flames exist.”).

. Overlooked by the parties is that when a "bum” may occur is specifically limited to "Open Burning Hours” defined as daytime hours — beginning at 9:00 am ET after which "the fire must discontinue spreading one hour after sunset” — or to nighttime hours under even more limited conditions. See Rule 51-2.006(2)(b), Fla. Admin. Code (2005). Thus, "burning” must begin and conclude on each day, the fire not "spreading” thereafter. "Burn” and "burning” thereby have technical and temporal meanings that limit the burn period to those days specified in the prescription, which is consistent with the Division’s interpretation of the open burn statute.